**BERKLEE COLLEGE OF MUSIC,**
**Plaintiff, Appellee,**

v.

**BERKLEE CHAPTER OF the MASSA-CHUSETTS FEDERATION OF TEACHERS, LOCAL 4412, AFT, AFL-CIO, Defendant, Appellant.**

**No. 88–1073.**

United States Court of Appeals,
First Circuit.

Heard June 8, 1988.
Decided Sept. 27, 1988.

Jeffrey W. Jacobsen, Associate Counsel, Boston, Mass., for defendant, appellant.

Paul V. Lyons with whom R. Michael Cassidy and Foley, Hoag & Eliot, Boston, Mass., were, on brief, for plaintiff, appellee.

Before CAMPBELL, Chief Judge, BREYER, Circuit Judge, and ACOSTA,* District Judge.

BREYER, Circuit Judge.

The appellant union, representing Joyce Lucia, a part-time teacher at the Berklee College of Music, asked an arbitrator to resolve Lucia's grievance against the school, a grievance based upon the College's refusal to hire Lucia full time. The College pointed out to the arbitrator that the collective bargaining agreement, which provided for arbitration, specified that grievances (like this one) that originate "from an action outside a particular department or division ... must be presented in writing to the Dean of Faculty within ten (10) calendar days after the action to be grieved occurred." The College also pointed to the undisputed fact that the union did not file its written grievance with the College dean until 14 or 15 days after "the action to be grieved" (the denial of full-time status) occurred. The College asked the arbitrator to find that this procedural failing barred consideration of the merits of the grievance.

The arbitrator noted that the contract did not specify the legal consequence of a late filing; from that he inferred that he had the authority to overlook de minimis violations; and he found the present violation de minimis because the contract was in its first year, Lucia might have thought she was supposed to proceed under a different provision (for grievances originating within a department) with a fifteen day time limit, and the delay (4–5 days) did not harm anyone. The arbitrator therefore concluded that the merits of the grievance were arbitrable.

The College then asked the district court to set aside the arbitrator's order, 29 U.S.C.

§ 185 (1982), as outside the limits of the authority granted him by the collective bargaining agreement. See, e.g., United Paperworkers International Union v. Misco, Inc., —— U.S. ——, 108 S.Ct. 364, 370–72, 98 L.Ed.2d 286 (1987); United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 599, 80 S.Ct. 1358, 1362, 4 L.Ed.2d 1424 (1960). The district court, finding the contractual language clear, granted the College's request. The union now appeals.

Since the time the district court decided this case, the Supreme Court has reiterated, in language stronger than previously used, that matters of contract interpretation are typically up to the arbitrator, not the courts. Misco, supra. The Supreme Court explained that an "arbitrator's award settling a dispute with respect to the interpretation or application of a labor agreement must draw its essence from the contract and cannot simply reflect the arbitrator's own notions of industrial justice. But as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." Misco, 108 S.Ct. at 371. We have characterized this language as specifying that any "exception" to the normal rule (that forbids the court to find an arbitrator's interpretation outside the authority delegated to him by the contract) is extremely narrow. S.D. Warren Company v. United Paperworkers' International Union, AFL–CIO, Local 1069, 846 F.2d 827, 828 (1st Cir.1988).

Only the narrowest of exceptions could exclude this arbitrator's interpretation, for not only does the contract say that the union "must" bring the grievance within 10 days, but it also says that "time limits" such as this one "may only be waived by mutual written consent," a consent that here was not forthcoming. Nonetheless, taking the Supreme Court at its word, we uphold the arbitrator's decision because we find a plausible argument that favors his

* Of the District of Puerto Rico, sitting by designa-

tion.

interpretation. That argument runs as follows.

First, the contract rule in question concerns procedural time limits, and the Supreme Court has recently reiterated that "rules of procedure should be liberally construed and . . . 'mere technicalities' should not stand in the way of consideration of a case on its merits." *Torres v. Oakland Scavenger Company,* — U.S. —, 108 S.Ct. 2405, 2408, 101 L.Ed.2d 285 (1988) (quoting *Foman v. Davis,* 371 U.S. 178, 181, 83 S.Ct. 227, 229, 9 L.Ed.2d 222 (1962)); *see, e.g., Houston v. Lack,* — U.S. —, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988). Sometimes, as with the federal procedural rules, a separate rule specifically grants to a court the power to extend time limits imposed by other rules. *See, e.g.,* Fed.R. Civ.P. 6(b); Fed.R.App.P. 26(b). In other instances, however, courts construe absolute-sounding language (say, in a statute of limitations) against a background of judicially created exceptions. *See, e.g., Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 392, 102 S.Ct. 1127, 1132, 71 L.Ed.2d 234 (1982) (Title VII filing deadline ("A charge under this section *shall* be filed within one hundred and eighty days. . . ." 42 U.S.C. § 2000e–5(e) (1982) (emphasis added)), "like a statute of limitations, is subject to waiver, estoppel, and equitable tolling."); *Bailey v. Glover,* 88 U.S. (21 Wall.) 342, 348–49, 22 L.Ed. 636 (1874) (similar holding in respect to statute of limitations in Bankruptcy Act of 1867) *see generally Cerbone v. International Ladies' Garment Workers' Union,* 768 F.2d 45, 48–50 (2nd Cir.1985) (explaining basis for tolling of filing deadline under the ADEA ("a charge *shall* be filed within 180 days . . ." 29 U.S.C. § 626(d) (1982) (emphasis added)).

Arbitrators have read such exceptions into literally absolute-sounding time limits in labor contracts; sometimes they have done so in light of the parties' own history of practice, *Peru Foundry Co.* 73 LA 959, 960 (Sembower, 1979), but sometimes not, *International Paper Co.,* 82 LA 306 (Williams, 1984). This background suggests that the parties may not have meant by the contract's word "must" that failure to comply always, automatically bars a grievance, no matter what the circumstances. After all, would the time limit not have been extended had the employer, say, through trick, prevented the filing of the grievance? *See Cerbone, supra.*

Second, it is not difficult to find other, more specific language the parties might have used had they intended to deprive the arbitrator of the power to make *'de minimis'* exceptions. As the arbitrator here noted, some labor contracts do contain express provisions that noncompliance with a particular time limit means the grievance will "be considered settled." *See, e.g., Detroit Coil Company v. International Association of Machinists & Aerospace Workers, Lodge #82,* 594 F.2d 575 (6th Cir.1979) (contract says, "Unless . . . the Company is notified within eight (8) working days . . . the grievance . . . shall be considered settled."). Indeed, the contract here at issue does contain such a provision in respect to *appeals* of grievances (in the pre-arbitration stage of the process). It says:

> The [Division Chairperson's] answer *will be deemed to be the final resolution* [of a Step 2 grievance] unless appealed within ten (10) calendar days from the date of the answer.

(Emphasis added.) This passage concerns grievances filed in accordance with Step 2, and appealed to Step 3. Similar language controls appeals from Step 1 to Step 2, and from Step 3 to Step 4. But, this language does not cover grievances, like this one, initiated at Step 3. The contract shows that the parties knew how to specify more strongly that missing a deadline would bar further consideration of the grievance. And, it is at least conceivable that one might want to hold a grievant more strictly to procedural rules once he has begun the grievance process.

Third, the contract's statement that the time limits "may only be waived by mutual written consent," is less clear than may at first appear. The union argues that the language is meant to apply to waivers *by the parties,* not remedies or exceptions applied by the arbitrator. It adds that the

purpose of the clause is to prevent a grievant from claiming that the company *orally* waived the time limit; rather, the grievant, to show waiver, would have to produce a *written* waiver signed by the company. As so interpreted, this "exceptions" clause would not apply where the arbitrator, in effect, excused noncompliance not because of "waiver," but because of, say, inequity or the *de minimis* nature of the violation.

Fourth, the contract here differs significantly from that in *S.D. Warren*, where we applied the *Misco* exception. In *S.D. Warren*, the contract said that management had the "sole right" to dismiss a person who violated Mill Rule 7, and the arbitrator found that the employees had violated Mill Rule 7. We could not think of a way to express more clearly than through the use of the words "sole right" the fact that it was up to management, not the arbitrator, to decide whether or not to dismiss the employee. Here, by contrast, the arbitrator and the union point to a fairly obvious way (a way used elsewhere in this very contract) to express clearly that failure to meet the filing deadlines bars further consideration of a grievance.

Whether we would find these arguments convincing were it up to us to interpret the contract is beside the point. The question is whether these arguments make the arbitrator's interpretation plausible. We can imagine some judges or arbitrators accepting these arguments (without stretching the imagination very far). That being so, we must uphold the arbitrator's determination. *Misco, supra.*

The judgment of the district court is REVERSED.

## APPENDIX

### *Faculty Contract Agreement*

#### *1986–89*

*STEP 3.*

If the grievance is appealed from Step 2, the Union must present the grievance in writing within ten (10) calendar days from the receipt of the Division Chairperson's answer, to the Dean of Faculty. If the grievance originates from an action outside a particular Department or Division, it must be presented in writing to the Dean of Faculty within ten (10) calendar days after the action to be grieved occurred. Within fifteen (15) calendar days of the receipt of the written grievance, the Dean of Faculty or designee may meet with the grievant and Union President or designated elected official of the Union to discuss the grievance. The Dean of Faculty or designee shall give a written answer within fifteen (15) calendar days after said meeting. If no written answer is given within fifteen (15) calendar days, the answer will be deemed to be a denial of the grievance. The answer will be deemed to be the final resolution unless appealed to Step 4 within fifteen (15) calendar days from the date of the answer.

.     .     .     .     .

### GENERAL PROVISIONS

.     .     .     .     .

E. Time limits designated in this Article for processing grievances and for bringing a matter to arbitration may only be extended by mutual written consent.

ACOSTA, District Judge (dissenting).

This case is like an optical illusion. When viewed from one perspective one sees one thing. When viewed from another something else is perceived. It appears that the majority's engrossment has been on the narrow scope of its reviewing authority under *Misco*.[1] I, on the other hand, see an exception in perceptable, if not bold, relief permitted even under the extremely narrow strictures of *Misco*.

The pertinent provisions of the collective bargaining agreement that are at the heart of this appeal are as follows:

If the <u>grievance</u> originates from an action *outside* a particular department or division, it *must* be presented in writing

---

1. *United Paperworkers International Union v. Misco, Inc.,* —— U.S. ——, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987).

to the dean of faculty within <u>ten (10) calendar days</u> after the action to be grieved occurred. Step 3 of Article XI (underline supplied).

Time limits designated in this Article for processing grievances and for bringing a matter to arbitration may <u>only be extended by mutual written consent.</u> Subparagraph E of the General Provisions of Article XI (underline supplied).

... The arbitrator may decide <u>only</u> whether the Employer violated this Agreement as <u>alleged</u> in the <u>grievance</u> and the appropriate remedy under this Agreement, if any. Subparagraph M of the General Provisions (underline supplied).

... All rights and duties of both parties are <u>specifically expressed</u> in this Agreement and such expression is <u>all inclusive.</u> This Agreement constitutes the entire agreement between the parties and concludes collective bargaining for its terms, subject <u>only to a mutual agreement to amend or supplement this Agreement.</u> Subparagraph A of Article XXVII (underline supplied).

Taken together, I am, frankly, hard put to see how the language of the contract could be more *un*ambiguous. But, as the majority has indicated, as long as the arbitrator is "arguably" construing the contract "this is beside the point."[2] True, what is arguable to one person can be another person's gospel and with lawyers trained in facile rhetoric, polemicists abound who can find anything arguable. I for one, however, feel that reason must still rule the use and intent of our juridical language lest we fall prey to Lewis Carroll's famous exposition that the question is not what a word means but which is to be master: the word or its user.[3]

Since anything can be "arguable," the test must really be did the arbitrator give a reasonable reading to the text of the contract he construed and was he reasonably *qua* arguably acting *ex officio*. In the present case it was the bargainers, i.e. the parties, who mastered the text of the Agreement and there is *no* dispute that when they said grievances "must be" filed within 10 days and that extensions could "only be" gained by mutual written consent they meant exactly that. The arbitrator does not, indeed cannot, give this conclusory language any other meaning. Instead, he abandons the text, sits *ex post facto* as the third party at the bargaining table, and says to the parties "when you said 'must' and 'only' you really didn't mean to include this case because you did not make it absolutely clear that anything filed past the deadline, no matter how 'harmless' the error, would not be considered." Thus the arbitrator, quite independently, decided that the words of the Agreement meant what he chose them to mean, nothing more nor less.

The majority apparently feels compelled by *Misco* to crown the arbitrator master not only of the language of the Agreement but of the very subtle weighing of equitable principles such that a violation of a clear contract provision will be disregarded because it is perceived by the arbitrator, without any explicit foundation, as minimal. The majority finds that this *ultra-contratu* act by the arbitrator was "arguably" within his prerogatives. But the contract, the main source of his power, does not say that an arbitrator can do what this one did. Nor does it allow for the quick side-stepping of clear unequivocal contractual language simply because the admitted violation was a matter of a few days tardiness. Implicitly, the majority would deth-

---

**2.** It is important to note that while the majority almost exclusively relies on the "arguability" factor the *Misco* analysis actually involves *two* steps: (1) a determination of whether or not the arbitrator is "arguably construing or applying the contract"; *and* (2) a determination as to whether or not the arbitrator was acting within the scope of his authority. *Id.,* 108 S.Ct. at 371. The second leg is discussed more fully later in this opinion.

**3.** Lewis Carroll *Through the Looking Glass* Signet Classics, N.Y. (1960) p. 186–87. "When *I* use a word," Humpty Dumpty said, in rather a scornful tone, "it means just what I choose it to mean—neither more nor less." "The question is," said Alice, "whether you *can* make words mean so many different things." "The question is," said Humpty Dumpty, "which is to be master—that's all."

rone the arbitrator had the delay been more substantial.

### The Arbitrator's Reasoning

The arbitrator acknowledged that Joyce Lucia filed her grievance four or five days late. Yet, in the face of all the above-cited provisions of the contract, the arbitrator inferred he had the authority to overlook "de minimis" violations because the contract did not specify the legal consequence of a late filing and besides (as the majority accepts as arguable) the grievant "might have thought she was supposed to proceed under a different provision "... since the contract was only in its first year. He found, further, that the 4–5 days delay "did not harm anyone." (Underline supplied.)

First of all, what should be kept in mind is that we are not dealing with an adhesion-type contract. The Agreement was the hammered-out result between two knowledgeable parties sophisticated in collective bargaining. Further, Lucia was an officer of one of the parties. In the light of this I find it difficult to accept the nescient role of the grievant which the arbitrator has chosen to place her in.[4]

Nor do I agree that "no one was harmed." Any party who is reasonably relying on the specific terms of a contract is "harmed" if that reliance later proves to be erroneous for whatever reason. It has its detrimental consequences in the time and expense involved in the arbitration process and possible adverse results which this appeal is obviously fighting to avoid.

Furthermore, I am not prepared to accept that an arbitrator should have the authority to resolve unambiguous, non-subject-matter procedural issues because a grievant "might" have been confused about which provision to proceed under. Nor do I understand the arbitrator's *ratio decidendi*. If the failure was the lack of specified consequences or not giving grievant adequate notice what difference then that it was only a four-day violation? If the delay had been forty days there would still have been no written consequences and no notice and thus no bar to the grievance under the arbitrator's formula. In other words, classifying the violation as "de minimis" does not support the main reason the arbitrator ruled in favor of grievant: that the text of the Agreement did not give grievant sufficient notice because it did not specify the penalty for late filings.

Therefore, the core issue from which all else apparently flows is whether the failure to specify the consequences of a missed deadline which deadline was stated in clear, straightforward language, authorizes an arbitrator to fashion a remedy. The optical illusion again comes into play when the majority concentrates its gaze on the fact that the Agreement specifies consequences for the inaction of the Division Chairperson (steps 1 and 2) and the Union (step 4) for grievances *within a particular department or division*[5] while no consequence is specified for grievances originating *outside the department or division*.[6] I see a different picture in that if a division chairperson or union fails to act, matters are pretty much left up in the air and, therefore, the specifying of a resulting consequence

---

4. A kind of noble indulgence that has the savor of a "personal notion of industrial justice." *Misco*, 108 S.Ct. at 371.

5. Step 1 provides in pertinent part: "... Within ten (10) calendar days of such grievance presentation, the Department Chairperson may meet with the grievant and a union representative and will give his/her written answer to the Union. If no written answer is given within ten (10) calendar days, the answer will be deemed to be a denial of the grievance...."
Step 2 provides in part: "... The Division Chairperson shall give a written answer within five (5) days calendar days after said meeting. If no written answer is given within five (5) calendar days, the answer will be deemed to be a denial of the grievance...."
Step 4 provides in part: "The Union may submit the written grievance to arbitration within thirty (30) calendar days of such meeting. If the Union does not timely submit the grievance to arbitration, the decision of Step 3 will be final...."

6. Step 3 provides in part: "... If the grievance originates from an action outside a particular department or division, it must be presented in writing to the Dean of Faculty within ten (10) calendar days after the action to be grieved occurred...." (Underline supplied.)

would be required. I do not see that the spelling out of the consequences of a late filing as being necessary in the case of a grievant who is *required* to file within a clearly specified time. If he or she files within the time specified it seems perfectly clear that the matter will proceed. If he or she does not, the matter does not proceed. In other words, it is totally unnecessary to specify the obvious. In any event, any disagreement I may have with the arbitrator's interpretation of the meaning and effect of the ten-day limitation is not the underlying basis of my dissent as I will point out further in this opinion.

I accept that an arbitrator's fact-finding may be improvident, erroneous or "silly"[7] and that he is even entitled to refuse to consider evidence[8] if his reasoning is "arguable" and his decision is not procured by fraud or dishonesty. What I have great difficulty in countenancing, however, is that an arbitrator may ignore the plain language of a collective bargaining agreement where 1) the parties have not authorized him to give meaning to the language of the agreement[9]; 2) where the "procedural" question of time limitation did not "grow out of the dispute" nor have a "bearing" on its final disposition[10]; and 3) where there is a question of "explicit, well defined, and dominant" public policy exemplified by "laws and legal precedents" which is ultimately one for resolution by the Court.[11]

7.  *Misco*, 108 S.Ct. at 371.

8.  Though the Supreme Court found that "evidentiary matters were *otherwise* left to the arbitrator" it gave the ineluctible impression that the arbitrator would have to strictly abide by the clearly enunciated "ground rules" in the contract which forbade him to consider hearsay evidence. *Id.*

9.  *Misco*, 108 S.Ct. at 371, citing *Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. at 599, 80 S.Ct. at 1362 ("the arbitrator may not ignore the plain language of the contract; *but the parties having authorized the arbitrator to give meaning to the language of the agreement*, a court should not reject an award on the ground that the arbitrator misread the contract.") (Emphasis added.) *Steelworkers* dealt with the authorized interpretation of the phrase "unjust suspension" found in a collective bargaining agreement. It

## Authority Under the Contract

The Supreme Court has summed up the state of the law with respect to the authority of an arbitrator:

> [T]he arbitrator's award settling a dispute with respect to the interpretation or application of a labor agreement must draw its essence from the contract and cannot simply reflect the arbitrator's own notions of industrial justice. But as long as the arbitrator is <u>even arguably construing</u> or applying <u>the contract and acting within the scope of his authority,</u> that a court is convinced he committed serious error does not suffice to overturn his decision. (underline supplied)

*Misco*, 108 S.Ct. at 371.

Nowhere do I find in the contract at issue that the arbitrator is to give meaning to the language concerning the time limits. On the contrary, the combined reading of General Provisions E and M of Article XI should have been sufficient to inform him he would be out of bounds to entertain any consideration of this matter. Nor does the record reflect that the *parties* authorized the arbitrator to consider the issue as contemplated by the Supreme Court in *Steelworkers v. Enterprise Wheel & Car Corp.*, see *supra* note 9.

The parties *did* agree that the arbitrator should consider the following issue:

> Was the grievance filed in this matter timely in accordance with the collective bargaining agreement? (App. at 41.)

is distinguishable from the present case not only because the statement of the issue that the parties in *Steelworkers* presented to the arbitrator clearly gave him wide interpretative powers but also because the determination of whether or not the claimant was unjustly suspended grew out of the dispute and had a heavy bearing on its final disposition. *See infra* note 10. Therefore, *Steelworkers* cannot be seen as undermining the basic rule that an arbitrator does not have a free license to (mis)interpret clear and unambiguous language set forth in a contract.

10.  *Misco*, 108 S.Ct. at 372.

11.  *Misco*, 108 S.Ct. at 373; *W.R. Grace & Co. v. Rubber Workers*, 461 U.S. 757, 766, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298 (1983).

Thus, the simple matter before the arbitrator was to: (1) look at the filing date of the grievance ("grievance filed") and (2) compare that date with the time limits proscribed in the Agreement ("in accordance with the collective bargaining agreement"); to then determine if the grievance was "timely." Thus, the text of this statement of the issue clearly shows that this, unlike *Steelworkers,* was not a case where the parties allowed the arbitrator to "give meaning" to the ambiguous language of a contract (such as "unjust suspension" or "good cause" for firing) but rather the parties meant the arbitrator to apply the specific terms of the contract to the undisputed facts of the case at hand.

That this was the agreement of the parties as to the issue cannot be doubted because the arbitrator, after transcribing the above statement of the issue, went on to say: "The Union suggested an additional question, *which the College did not agree to.* That question was:

In the event the grievance was not filed timely were there extenuating circumstances such that the grievance should still be heard on the merits?

Appendix at 41. (Emphasis added.)

Thus the arbitrator acted not pursuant to the authority given by both parties but rather upon the unilateral request by one party which he acknowledged was rejected by the other. Absent any other source of authority that can be gained from the contract, the arbitrator was expressly limited to a consideration of the timeliness of the grievance and could not entertain any "extenuating circumstances" or make other equitable determinations. The contract was clear on its face. Accordingly, there was no need to resort to extrinsic evidence. Here the arbitrator obviously and unjustifiably overstepped that limit and we should strike his decision as *ultra vires.*

### The Procedural Question Issue

*Misco* also added, consistent with its observation in *John Wiley & Sons, Inc. v. Livingston,* 376 U.S. 543, 557, 84 S.Ct. 909, 918, 11 L.Ed.2d 898 (1964), "that when the subject matter of a dispute is arbitrable, 'procedural' questions which *grow out of the dispute* and *bear on its final disposition* are to be left to the arbitrators." (emphasis added) *Misco,* 108 S.Ct. at 372.

I agree that intertwined issues of "substance" and "procedure" growing out of a single dispute should not be carved up between two different forums and that "once it is determined that the parties are obligated to submit the <u>subject matter</u> of a dispute to arbitration, 'procedural' questions which <u>grow out of the dispute</u> and <u>have a bearing on its final disposition</u> should be left to the arbitrator." (Underline supplied.) *John Wiley & Sons, Inc.,* 376 U.S. at 557, 84 S.Ct. at 918. I submit, however, that the ten (10) day time limit is not a part of the "subject matter" of the dispute nor does it "bear" on its final disposition.

The Agreement very clearly states that "the arbitrator may decide *only* whether the employer violated this Agreement *as alleged* in the *grievance* and the appropriate remedy under this Agreement, if any."[12] The grievance or subject matter of this case did not grow out of a dispute about whether a 4–5 days delay should be overlooked. The subject matter arose out of the denial of Lucia's request to gain full-time status in the Voice Department. Therefore, the time limit requirement is not a proper subject within the scope of the arbitrator's authority nor is it intertwined with any issues of a substantive nature.

### The Question of Public Policy

Acknowledging its holding in *W.R. Grace and Co. v. Rubber Workers,* 461 U.S. 757, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983), the Supreme Court has recognized that the courts may not enforce collective bargaining agreements that are contrary to public policy. It cautioned, however, "that a court's refusal to enforce an arbitrator's interpretation of such contracts is limited to situations where the contract as interpreted would violate 'some explicit public policy that is' well defined and dominant, and is to be ascertained by reference to the

---

**12.** Last sentence of Subparagraph M of the General Provisions.

laws and legal precedents and not from general considerations of <u>supposed</u> public interests." *Misco*, 108 S.Ct. at 373 (underline supplied).

Despite the Supreme Court's ruling in *Misco* that it did not recognize an unsubstantiated public policy against the operation of dangerous machinery by persons under the influence of drugs or alcohol[13] the law continues to be that "a court may not enforce a collective bargaining agreement that is contrary to public policy and that the question of public policy is ultimately one for resolution by the courts." *W.R. Grace*, 461 U.S. at 766, 103 S.Ct. at 2183, 76 L.Ed.2d at 299.

I submit, at the risk of sounding trite, that a provision in a contract between parties which provides in plain, certain language that a filing *must* be within a specified term and that the time limitation may not be extended except by mutual written consent is a well defined, dominant expression of public policy which may be ascertained by reference to laws and legal precedents and arises from a general consideration of a real public interest. In short, in unabashed truistic terms, the solemnity and integrity of an agreement between two or more competent parties creating an obligation to do or not to do a particular thing is of great public importance in our jurisprudential history. I find the contract says what it means and means what it says and fits quite comfortably within the narrow confines of a *Misco* exception.

It seems to me, also, that one of the results of the majority opinion is that an arbitrator has an even wider latitude of power of interpretation than an Article III judge. While an Article III judge may construe the absolute-sounding language of a statute of limitations where there is evidence of a waiver or grounds for estoppel or equitable tolling, the arbitrator is free to construe a specific time limitation where none of these conditions exist. With respect to a waiver there is no indication of any "history or practice" of the parties to sustain such a claim.[14] The majority states that "this background/where arbitrators have read such exceptions into literally absolute-sounding time limits in labor contracts/ *suggests* that the parties *may* not have meant by the contract's word 'must' that failure to comply always, automatically bars a grievance, no matter what the circumstances." The majority then asks "would the time limit not have been extended had the employer, say, through trick, prevented the filing of the grievance?" But in our case there was no fraud, no dishonesty, no waiver, no grounds for estoppel or equitable tolling, and no "trick."[15]

If we are to stretch the *Misco* rule of arguability to include an arbitrator's uninvited and unauthorized incursion into the supposed equities of a case we are undermining the very process, i.e., collective bargaining and arbitration, that *Misco* sought to uphold. Such a result does not withstand logic for it cannot be reasonably said, and thus be "arguable," that an arbitrator can go beyond the intent of an agreement, when that intent is first and foremost embodied, indeed enshrined, in the explicit, straightforward language the parties bargained for.

I submit that the arbitrator in this case was not only acting outside the scope of his authority but that the Court by sanctioning his actions is opening up a "Pandora's box" of nettlesome questions. Would a delay of 7 or 8 days under the exact circumstances of this case be acceptable as "de minimis"? How about 16 or 17 days? I would venture that there are few, if any, who would accept a delay of 40 days. This being the case, on what basis then would we disregard the wide latitude granted to the arbitrator by the majority? If we say a delay of 40 days is obviously not "de minimis" and constitutes serious error do we not run afoul of *Misco* which emphatically

---

13. 108 S.Ct. at 375, 6.

14. *Peru Foundry Co.*, 73 L.A. 959, 960 (Sembower, 1979).

15. A discussion of the *possibilities* (of fraud, waiver, etc.) in the light of the plain facts ultimately results in bootstrap reasoning to save an otherwise unsupported conclusion.

states that even though "a court is *convinced* he /the arbitrator/ committed *serious error* does not suffice to overturn his decision."[16] It no longer suffices to say that when the language, which the parties fashioned at arms-length, is clear the arbitrator must rule upon it and not around it. The effect is to give to the arbitrator the authority to make decisions that the parties never envisioned nor intended.

### Conclusion

In Warren II,[17] the contract said that the management had the "sole right" to dismiss a person who violated Mill Rule 7. The arbitrator found that the employees had violated Mill Rule 7. As the majority states regarding *Warren II:* "We could not think of a way to express more clearly than through the use of the words 'sole right' the fact that it was up to management, not the arbitrator, to decide whether or not to dismiss the employee." Similarly, given that it was not necessary to spell out the consequences for failing to file within the ten-day limit and given that the time limitation was not the subject matter of the dispute thereby placing the arbitrator outside the scope of his authority, I too cannot think of a way to express more clearly than through the use of the words "within 10 calendar days" and "time limits ... may only be extended by mutual written consent" the fact that the District Court's decision was correct.

I would affirm.

---

16. *Misco,* 108 S.Ct. at 371.

17. *S.D. Warren Company v. United Paperworkers International Union,* 846 F.2d 827 (1st Cir. 1988).