927 F.2d 604
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
MOR-FLO INDUSTRIES, INC., CHATTANOOGA DIVISION, Plaintiff-Appellant,
v.
INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, et al.,
Defendants-Appellees.
 No. 90-5605.
 United States Court of Appeals, Sixth Circuit.
 March 7, 1991.
 
 On Appeal from the United States District Court for the Eastern District of Tennessee, No. 89-00486; Edgar, J.
 E.D.Tenn.
 REVERSED AND REMANDED.
 Before BOYCE F. MARTIN, Jr. and DAVID R. NELSON, Circuit Judges, and JOHN W. PECK, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 This is an appeal from a judgment confirming an award made by a labor arbitrator pursuant to the grievance procedure of a collective bargaining agreement. The award ordered reinstatement of an employee who had been discharged for remaining away from work after the expiration of a leave of absence.
 
 
 2
 The collective bargaining agreement made it mandatory that the grievance of a discharged employee be filed in writing; that it be signed by the aggrieved person; and that prescribed time limits be observed during the progress of the matter through the contractually-established procedure for resolving disputes over application of the agreement. The arbitrator found that no written grievance had ever been filed in this case; that the prescribed time limits had not been observed; and that "[t]he explicit language of the Agreement was not complied with by the Grievant or the Union with respect to the mandated procedures for filing and processing a grievance."
 
 
 3
 The arbitrator also found, however, that compliance with the mandated procedures had been waived; the parties, he said, had tacitly agreed to follow a different procedure. On the strength of this tacit agreement, the arbitrator determined that he had been given jurisdiction to decide the merits of the dispute.
 
 
 4
 The arbitrator quoted, but failed to discuss, a provision in the collective bargaining agreement which stated that the arbitrator should have jurisdiction and authority "only" to interpret and apply the "express" provisions of the agreement. A subsequent anti-waiver provision was ignored by the arbitrator altogether. (This anti-waiver provision, according to the agreement, was not subject to the grievance procedure--and because arbitration was the final step in the grievance procedure, the anti-waiver provision was thus not subject to arbitration.)
 
 
 5
 The question presented on appeal is a narrow one; whether the particular collective bargaining agreement entered into by the parties in this case gave the arbitrator jurisdiction and authority to apply a tacit agreement waiving express provisions of the written agreement. Because the written agreement withheld such authority from the arbitrator, we conclude that the arbitrator's resolution of the jurisdictional question cannot be sustained. The judgment affirming the award will be reversed.
 
 
 6
 * The grievant, Edward Freeman, was hired as a bargaining-unit employee by plaintiff Mor-Flo Industries, Inc., in 1985. Mr. Freeman injured his back soon thereafter. His subsequent employment history was marked by a number of medical leaves of absence.
 
 
 7
 In 1988 Mr. Freeman overstayed a leave of absence. According to the company's evidence, the leave expired on May 16. Mr. Freeman was apparently hospitalized at that time, and he testified before the arbitrator that the company was advised both on May 11 and on May 17 that he was in the hospital. Mor-Flo, which denied having received such advice, issued Mr. Freeman a written separation notice on May 29. The notice gave the following reason for the separation:
 
 
 8
 "3 day absent. No call in. Voluntarily quit. Quit without notice. Did not renew L-O-A[.]"
 
 
 9
 The notice was evidently drafted with an eye to Sec. 5.2 of the collective bargaining agreement between Mor-Flo and the defendant unions. Section 5.2 provided in pertinent part that "[i]f any employee on leave of absence ... fails to return to work after a leave of absence, he shall be terminated as a voluntary quit." (Elsewhere in the agreement the company reserved the right to discharge employees for "just cause.")
 
 
 10
 Article 6 of the collective bargaining agreement, captioned "Grievance Procedure," gave the following definition of a grievance: "A grievance is a dispute that arises between an aggrieved employee ... and the Company over the interpretation or application of the express provisions of this Agreement." Article 6 went on to spell out a four-step procedure under which grievances were to be processed. Each step had its own time limits.
 
 
 11
 Under Step 1, the aggrieved employee was required to present his grievance to his supervisor orally not later than the third working day after he knew or should have known of the cause of the grievance. If the supervisor failed to give a timely answer, or if the answer proved unsatisfactory, the grievant's union steward had three days within which to file a written grievance with the plant manager, thereby initiating Step 2. A grievance meeting would then be held. If the grievance was not adjusted, the steward had seven days to initiate Step 3 by requesting, in writing, a further meeting with the plant manager or his designated representative.
 
 
 12
 Grievances over discharges were to be handled somewhat differently in the initial steps of the procedure. Section 7.2 of the collective bargaining agreement specified that:
 
 
 13
 "Grievances filed by discharged employees shall be in writing and signed by the aggrieved employee as in Step 2 and shall be filed in accordance with Step 3 of the grievance procedure and not later than the third (3rd) working day after the day the employee receives written notice of the discharge." (Emphasis supplied.)
 
 
 14
 If such grievances were not adjusted, the union could proceed to Step 4:
 
 
 15
 "If the grievance is not adjusted in Step 3, then the Union upon written notice to the Company not later than the tenth (10th) working day after the Company's answer in Step 3 may submit the grievance to arbitration." (Emphasis supplied.)
 
 
 16
 Under Sec. 6.3, the decision of the arbitrator was to be final and binding. Section 6.3 also provided, among other things, that
 
 
 17
 "The arbitrator shall have jurisdiction and authority only to interpret the express provisions of this Agreement and apply them to the particular case presented to him. The arbitrator shall have no authority to add to, detract from, or in any way modify the terms of this Agreement or any supplemental agreement."
 
 
 18
 Section 6.4 went on to provide that "[a]dherence to the time limits of this Article are [sic] of the essence and no showing of prejudice shall be required...." (Emphasis supplied.)
 
 
 19
 Section 7.3, the anti-waiver provision, read in its entirety as follows:
 
 
 20
 "Leniency in discipline by the Company in one or more instances shall not constitute a waiver by the Company of the right to give more severe discipline, up to and including discharge, in another instance. Failure by the Company to abide by this Agreement in one or more instances shall not constitute a waiver by the Company of the right to follow the Agreement in another instance. The just cause standard shall not be used to vary any other language in the Agreement. The matters contained in this Section are not subject to the grievance procedure." (Emphasis supplied.)
 
 
 21
 It is undisputed, in the case at bar, that Mr. Freeman failed to file the written grievance mandated by Sec. 7.2 of the collective bargaining agreement. Not only did he fail to file such a grievance within three working days after his receipt of written notice of the discharge, as that section required, he failed ever to file such a grievance. Nor did the union ever file a written grievance on his behalf: "There has been no written grievance filed," said the arbitrator, "even up to the day of the arbitration hearing...."
 
 
 22
 Noting that it was "quite clear" that neither Mr. Freeman nor the union had complied with the explicit and mandatory procedures for prosecuting a grievance, the arbitrator acknowledged that normally, at least, "[i]f either of the parties asserts its rights under the procedure in a timely manner, an arbitrator is obligated to recognize those rights and apply the clear language of the Agreement." Here, however, the arbitrator pointed out that the union business manager had testified, without contradiction, that
 
 
 23
 "[T]he parties had a number of conversations, including two step three meetings about the Edward Freeman termination. The parties exchanged positions and tried, as recently as six weeks before the arbitration hearing, to reach a mutual accommodation on the matter. Mr. James stated that the Company had never relied on the procedural requirements in the contract in order to bar further mutual consideration of the matter. Nor has the Company ever declined to discuss the matter because there was no written grievance filed."
 
 
 24
 The company may not have asserted its rights under the grievance procedure prior to the arbitration step, but it clearly asserted its rights at that point. As the arbitrator explained,
 
 
 25
 "The Company raised a procedural objection at the beginning of the hearing. The Company asserted that the Union had not complied with the provisions of the agreement between the parties where the agreement addresses itself to the filing of grievances and the time limits within which grievances are to be moved through the process. It is the Company's position that the arbitrator does not have a valid grievance upon which to rule since no written grievance was ever filed by the Grievant and further that even the oral discussions that occurred between the parties were outside of the time limits imposed by the contract.
 
 
 26
 The Company made it clear at the very outset that it would avail itself of every defense and would not foreclose the option of appealing the arbitrator's decision on arbitrability to a court of appropriate jurisdiction[,] should that decision be contrary to the Company's position on the matter. It was with this clear understanding on the part of all concerned parties that the hearing got underway."
 
 
 27
 The arbitrator decided that notwithstanding the company's attempt to assert its contractual rights at Step 4 of the grievance procedure, the earlier failure to insist that Mr. Freeman and the union abide by the contract constituted a de facto waiver of the company's right to invoke the language of the contract at any later stage. "While the arbitrator may not add to, subtract from or in any way alter the terms of the Agreement," concluded the arbitrator, "the parties may do so by acting upon a tacit agreement to follow a different procedure; the evidence indicates that they did so in this case."
 
 
 28
 Having thus decided that there was "a mutual de-facto waiver of the procedural requirements of the Agreement," the arbitrator proceeded to the merits of the case. Finding the termination to have been improper, he ordered that Mr. Freeman be reinstated with full seniority rights and six months' back pay. Mor-Flo then brought the present lawsuit, seeking to have the arbitral award vacated. On cross-motions for summary judgment the district court ruled in favor of the unions and declined to vacate the award. This appeal followed.
 
 II
 
 29
 Under the Taft-Hartley Act, "[f]inal adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement." 29 U.S.C. Sec. 173(d). Where the parties have agreed on a particular method for settling grievances, that is the method that must be used. See, generally, United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574 (1960); United Steelworkers of America v. American Mfg. Co., 363 U.S. 564 (1960); United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593 (1960).
 
 
 30
 Parties to labor agreements customarily agree on a method of grievance resolution that culminates in arbitration. Because it is of paramount importance that the agreed-upon method be honored, and because the parties have normally bargained to have grievances resolved by an arbitrator and not by a judge, courts have only a limited role to play when called upon to review the decision of an arbitrator.
 
 
 31
 Perhaps the most significant function of the courts in this regard is to determine whether the agreement to arbitrate did or did not cover the particular controversy at hand, and, if it did, to determine how broad a power the parties agreed to confer on the arbitrator. See Warrior & Gulf Navigation Co., 363 U.S. at 582. Once it has been determined that the controversy was arbitrable and that the arbitrator did not exceed the power given him under the agreement, it is not normally within the province of the courts to decide whether the arbitrator interpreted and applied the agreement correctly in resolving the merits of the dispute. It is the arbitrator's construction of the collective bargaining agreement that the parties bargained for, not the court's. Enterprise Wheel & Car Corp., 363 U.S. at 599.
 
 
 32
 Where an arbitrator has decided the question of his own power to arbitrate, we accord the arbitrator's decision on that issue the same degree of deference we accord arabitrators' decision in other contexts--at least if the issue of arbitrability has been submitted to the arbitrator "without reservation." Vic Wertz Distributing Co. v. Teamsters Local 1038, 898 F.2d 1136, 1140 (6th Cir.1990). "[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority," the Supreme Court has declared, a court is not entitled to overturn the arbitrator's decision merely because the court is convinced that it reflects "serious error." United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 38 (1987).
 
 
 33
 The Supreme Court has repeatedly said, however, that "the arbitrator's award settling a dispute with respect to the interpretation or application of a labor agreement must draw its essence from the contract and cannot simply reflect the arbitrator's own notions of industrial justice." Id. See also Enterprise Wheel & Car Corp., 363 U.S. at 597. "The arbitrator may not ignore the plain language of the contract...." Misco, 484 U.S. at 38. This basic principle applies in spades, of course, where the issue is whether the contract has empowered the arbitrator to act at all.
 
 III
 
 34
 In the case at bar, the arbitrator said that "[u]nder all but the most compelling of circumstances" he would have felt bound by what he himself called the "clear language" of the collective bargaining agreement. Given the failure of the grievant and the union to adhere to the language of the agreement in regard to the filing of grievances, the arbitrator said, he would have felt bound, absent compelling circumstances, to "declare that any grievance that was not processed in a timely manner suffers from a procedural defect which the arbitrator must recognize."
 
 
 35
 The "compelling circumstances" that made the arbitrator feel he was not bound by the clear language of the agreement in this particular case lay in the fact that after the time limits had expired, and notwithstanding Mr. Freeman's failure to file the required written grievance, the company participated in a number of conversations with the union about the merits of the discharge. The only factual reason cited by the arbitrator for his conclusion that he had been given power to decide the dispute boiled down to the fact that the company had never refused to discuss the matter with the union when asked to do so.
 
 
 36
 It is true, of course, that the company and the union could always have entered into a supplemental agreement changing the grievance procedure. Section 6.3, as the district court emphasized, expressly acknowledged the possibility that there might be a supplemental agreement. (The third sentence of Sec. 6.3, it will be recalled, provided that the arbitrator should have no authority to add to, detract from, or modify the terms of the agreement "or any supplemental agreement.")
 
 
 37
 It is also true, as the arbitrator pointed out, that a supplemental agreement changing the grievance procedure would not have to be explicit. If the parties chose to act upon a tacit agreement to follow a different procedure, as the arbitrator found they did in this case, nothing in the collective bargaining agreement prevented them from doing so.
 
 
 38
 But the fact that the parties were free to make whatever tacit agreements they wished does not necessarily mean that the parties ever agreed to give the arbitrator authority to interpret and apply tacit agreements. The parties might have chosen to give the arbitrator such authority, to be sure, but they might have chosen not to.
 
 
 39
 Here, as it happens, they clearly chose not to. The second sentence of Sec. 6.3 of the agreement says, in the plainest of English, that "[t]he arbitrator shall have jurisdiction and authority only to interpret [and apply] the express provisions of this Agreement...." (Emphasis supplied.)
 
 
 40
 By definition, that which is "tacit" cannot be "express." A tacit provision is the exact opposite of an express provision. In saying that the arbitrator had jurisdiction and authority "only to interpret [and apply] express provisions," therefore, the agreement had to be saying that the arbitrator was without authority to interpret and apply tacit provisions. No other construction of the second sentence of Sec. 6.3 could even arguably be legitimate, in our view--and neither the union, the arbitrator, nor the district court has undertaken to argue that this sentence means anything other than what it plainly says.
 
 
 41
 Although we view Sec. 6.3 as dispositive by itself, our opinion as to what the collective bargaining agreement did and did not empower the arbitrator to do is strengthened by Sec. 7.3, the agreement's anti-waiver provision. Under that provision, as we read it, a failure by the company to insist in one instance that Mr. Freeman and the union comply with the requirements of the grievance procedure could not constitute a waiver of the right to have those requirements complied with in another instance. Thus the company's willingness to participate in Step 3 meetings despite Mr. Freeman's failure to file a timely written grievance could not, under Sec. 7.3, constitute a de facto waiver of the requirement that Step 4 be initiated by the Union's giving "written notice to the Company not later than the tenth (10th) working day after the Company's answer in Step 3...." And we know that the anti-waiver provision of Sec. 7.3 is not subject to arbitration under the grievance procedure, because Sec. 7.3 explicitly says so: "The matters contained in this Section are not subject to the grievance procedure."
 
 
 42
 We are at a loss to see how the arbitrator could even arguably construe the last sentence of Sec. 7.3 as saying anything other than that the anti-waiver provision is not subject to arbitration. He certainly did not purport to give Sec. 7.3 a different construction, for he never referred to this section at all. He simply ignored it. In so doing, it seems to us, he violated the cardinal rule that an arbitrator "may not ignore the plain language of the contract...." Misco, 484 U.S. at 38.
 
 
 43
 One argument that might be offered in defense of the arbitrator's decision would run along these lines: if the parties could tacitly agree to waive the various requirements for prosecuting a grievance, they could also tacitly agree to waive all limitations on the arbitrator's jurisdiction, including those imposed by Secs. 6.3 and 7.3--and implicit in the arbitrator's resolution of the jurisdictional question, perhaps, is a finding that the contractual language which denied him jurisdiction was suspended by tacit agreement.
 
 
 44
 It is a sufficient answer to this argument that under the law of our circuit the express written provisions of collective bargaining agreements that are not subject to alteration or amendment in the grievance and arbitration process may not be overridden by unwritten side agreements, at least where the collective bargaining agreement does not expressly state that its terms may be overridden in this fashion. See International Brotherhood of Electrical Workers, Local 429 v. Toshiba America, Inc., 879 F.2d 208 (6th Cir.1989), which so holds. Cf. Detroit Coil Co. v. Int'l. Ass'n. of Machinists & Aerospace Workers, 594 F.2d 575 (6th Cir.), cert. denied, 444 U.S. 840 (1979). To the extent of any conflict between Toshiba and Berklee College of Music v. Berklee Chapter of the Mass. Fed'n of Teachers, Local 4412, 858 F.2d 31 (1st Cir.1988), cert. denied, 110 S.Ct. 53 (1989)--and we note that there may be no conflict, because of differences in contract language and because the defendant union did not contend, in Berklee, that there had been any waiver by mutual consent of the parties--we shall, of course, follow our own circuit precedent.
 
 
 45
 We note, finally, that Mor-Flo's decision to participate in the arbitration under a reservation of rights did not itself waive any objections to the arbitrator's jurisdiction. As the arbitrator explained in his award, everyone concerned clearly understood that there was no such waiver.
 
 
 46
 The judgment of the district court is REVERSED, and the case is REMANDED with instructions to enter judgment in favor of the plaintiff.