**DALLAS & MAVIS FORWARDING COMPANY, INC., Plaintiff–Appellant,**

v.

**GENERAL DRIVERS, WAREHOUSEMEN & HELPERS, LOCAL UNION NO. 89, Defendant–Appellee.**

No. 91–6421.

United States Court of Appeals, Sixth Circuit.

Argued June 18, 1992.

Decided Aug. 5, 1992.

Rehearing En Banc Denied Sept. 17, 1992.

James U. Smith, III, Smith & Smith, Louisville, Ky., C. John Holmquist, Jr. (argued and briefed), Linda G. Burwell, (briefed), Charfoos, Reiter, Peterson & Holmquist, Birmingham, Mich., for plaintiff-appellant.

Alton D. Priddy (argued and briefed), Hardy, Logan, Priddy & Cotton, Louisville, Ky., for defendant-appellee.

Before: MERRITT, Chief Judge; and KEITH and RYAN, Circuit Judges.

MERRITT, Chief Judge.

The majority of an arbitration board determined that the plaintiff violated provisions of a collective bargaining agreement by refusing to merge its seniority list with the list of another employer that laid off workers after a loss of business in the wake of a major contract revision. The plaintiff sought to have the award for the defendant vacated by the District Court. We agree with the court that the arbitration board's award was rationally drawn from the essence of the collective bargaining agreement, and so we affirm the grant of summary judgment to the defendant.

## I.

Plaintiff Dallas & Mavis [hereinafter "D & M"] delivers trucks and other vehicles from manufacturers to distribution points nationwide and in Canada. Like other employers engaged in the vehicle transshipment industry, D & M entered into a national collective bargaining agreement [hereinafter "Agreement"] with the principal union involved in this industry, the Teamsters, as well as a local supplemental agreement. D & M had an existing contract with the Ford Motor Company at its Louisville, Kentucky Truck Plant [hereinafter "KTP"] for a share of Ford's truck transshipment business from that plant. The defendant, Teamsters Local No. 89, represents the members of KTP's collective bargaining unit in this industry.

During the 1980s three companies were engaged by Ford to deliver completed trucks from KTP. These were D & M, which specialized in delivery by the "drive-

away" (*i.e.*, the "piggyback" mounting of one tractor onto another, with the lower vehicle as prime mover for both) method of shipment; Allied Systems, Inc. [hereinafter "Allied;" formerly known as Motor Convoy, Inc.], which transported trucks by the "truckaway" (loading onto tractor-driven trailers) method; and Transport Storage, Inc. [hereinafter "Transport"], which shipped trucks solely by railcar. During the early 1980s D & M shipped Ford trucks to the western portions of the United States and Canada. By mid-decade, it sought to expand its market into Transport's own delivery sector in the West and Canada.

In 1988 Ford announced that it would open rebidding on its existing KTP transshipment contracts. D & M entered its bid for what was heretofore Transport's rail deliveries, while also placing bids for the truckaway and driveaway methods. Ford awarded D & M a contract for motor deliveries into the Midwest, 11 western states and Canada, while Allied won its bid for preshipment preparations for KTP's trucks. D & M, however, had insufficient facilities in Louisville to cope with its burgeoning program. It thus was forced to look elsewhere for employees to staff the expanded routes. Transport's KTP employees were left jobless because all of its railhead operations there were eliminated in the recontracting process.

D & M entered discussions with the defendant about the company's projected staffing needs for the new operations. The plaintiff reasoned that it was obligated under the Agreement to offer the new job vacancies first to the laid-off Transport employees. Only after those positions were filled would D & M then create new positions for 14 Allied workers who had also been laid off in the wake of rebidding. Teamsters Local No. 89 disagreed, and it filed grievances on behalf of only Allied's and Transport's employees with the National Joint Arbitration Committee [hereinafter "Committee"]. These grievances required consideration at two Committee sessions in April and October 1988.

The Committee determined at the April meeting that the Agreement's provisions were not fully applicable. Instead of "canceling" Allied as a shipper, Ford's rebidding merely required realignments in Allied's service territories. Nevertheless, the Committee required the 14 laid-off Allied workers to be incorporated into D & M's work force, thus allowing them to "follow the work," *i.e.*, to allow them to transfer freely between employers performing essentially the same tasks. This principle was identified as a relatively common practice in the vehicle transportation industry.

This issue arose anew at the Committee's October 1988 meeting, coupled with a related seniority issue. D & M's employees objected that Local 89 had not informed them about the two grievances submitted to the Committee in April, and they contended that this violated their rights to adequate notice. Transport's employees likewise requested a transfer with full seniority rights to Allied. Allied denied these transfers on the grounds that their former employment in the rail yard was not so substantially similar to Allied's as to allow Transport's employees to "follow the work." Based on evidence that Allied was contemplating expansion, the Committee modified its April decision: D & M would no longer be required to provide positions on its seniority list to Allied's 14 employees. Separately, the Committee rebuffed the Transport employees' efforts to "follow the work" to either D & M or to Allied.

In October 1989, Ford again solicited bids on the KTP shipping operations as part of a wholesale redistribution of traffic in the eastern, southern and central United States. D & M now placed bids upon the "decking" (preshipment preparations) process, which it won from Allied. D & M also received part of its driveaway bid, while losing its upper Midwest routes to Allied. D & M prepared its new staffing plans in part upon the two 1991 Committee decisions. It anticipated that Allied's employees would not have a right to have their seniority merged with D & M's KTP seniority list. D & M offered the new decking jobs to its own drivers and employees at other facilities, as well to some non-

union workers. It also refused to hire any of Allied's laid-off workers.

D & M and Allied filed motions to establish seniority rights with the Committee in March 1990. These focused upon Article 5 (concerning the "dovetailing," or merger, of seniority rights) and Article 26 (governing the transfer of seniority rights). The Committee, however, was soon deadlocked on what should be the correct resolution. To break the impasse, the issue was referred by the Committee to a board of three professional FMCS arbitrators—one picked by the union, one by the employer, and a disinterested third arbitrator selected jointly by the other two—under Article 7, § 9.[1]

The arbitrators rendered an opinion and award in December 1990. The majority held that D & M had violated the Agreement in refusing to merge its KTP seniority list with Allied's list of laid-off employees. The board scrutinized Article 5, § 2,

which expressed a preference for merger of employee seniority rights under the Agreement,[2] and Article 5, § 4(c), which addressed the circumstances under which an employer's business is "canceled" by the shipper and when the canceled employer's workers could then be reassigned to a "remaining" employer.[3] In contrast stood Article 5, § 5(a), which required a shipper to cancel its business with an employer and then to transfer part or all of that work to another employer not doing business at the shipper's present location before dovetailing occurred.[4] The majority of the board reconciled these distinctions by examining Article 5, § 8,[5] stating that the rules suggested in the Agreement were meant only as illustrative guidelines and that the National Arbitration Committees were empowered by the Agreement to determine seniority questions.

The two majority arbitrators determined that the facts of the case fit more squarely

---

1. Article 7, § 9 provides that if a dispute becomes deadlocked by the Committee, the Committee shall submit the grievance to a three-member board of arbitration. The language of subsection (b) is particularly pertinent:

   The arbitrator shall have the authority to interpret and apply the provisions of this Agreement or Supplements thereto, where appropriate, but shall not have the authority to amend or modify this Agreement or Supplements ... or establish new terms and conditions....

2. That section states in relevant part: "Terminal seniority rights for all employees covered by this Agreement *shall* prevail, unless the Supplements or other provisions of this Agreement provide specifically to the contrary" (emphasis added).

3. Article 5, § 4(c) states:

   Seniority lists are dovetailed ... (c) [w]hen two (2) or more Employers share traffic from the same shipper at the same location, excluding port facilities, and the traffic of one (1) of the Employers is cancelled by the shipper and it is assigned to one (1) of the remaining Employers, whether or not there is a financial transaction of any kind involving the affected Employers....

4. That article provides:

   In the event a shipper cancels its business relationship with an Employer at a location, excluding port facilities, and transfers all or part of that business to another Employer which is not servicing that shipper at that

location, whether or not there is a financial transaction of any kind involving the affected Employers, both the active and laid-off employees of the cancelled Employer at that terminal and the laid-off employees of the succeeding Employer who choose to accept employment opportunity at the affected location shall be placed in a master dovetailed seniority list in accordance with their company seniority. The succeeding Employer shall afford work opportunities to the employees on that master seniority list in order of their seniority.

5. Article 5, § 8 provides as follows:

   The parties acknowledge that the above rules are intended solely as general standards and further agree that many factual situations may be presented to the Committee which necessitate modification or amendment in the application of these rules to specific factual cases.... Accordingly, the Employers and the Union acknowledge that questions involving the accrual, interpretation or application of seniority rights may arise which require different treatment. It is understood that the Employers, the Union and the National or Area Joint Arbitration Committees may mutually agree to such disposition of questions of seniority.... The National and Area Joint Arbitration Committees shall have the authority to determine the establishment and application of seniority in all situations presented to them and the seniority decisions of the Joint Arbitration Committee shall be final and binding....

under the ambit of § 4(c) than under § 5(a) or any other sections. They recognized that two possible interpretations could be accorded to § 4(c): either the subsection was inapplicable because Ford did not "cancel" all of Allied's traffic at KTP, or it was applicable because Allied "retained" some traffic—albeit of a different kind from its past operations—at KTP after Ford's 1990 renegotiations. While either interpretation might be correct, however, the majority interpreted Article 5, § 8 as authorizing them to extend that subsection's application to encompass the change in Allied's operations:

> [E]ven if the [arbitration board] were to determine that the facts of the present case fell outside the literal meaning of subsection 4(c), it would be proper to extend application of that subsection in accordance with section 8 of Article 5.

Arbitration Opinion and Award at 28. The board concluded that if Article 5, § 4(c) established only a guideline, it was "highly doubtful" that the Agreement's drafters would have intended for different results to arise from total versus partial cancellations of an employer's business. This interpretation was reached despite Article 5, § 7(b)'s specific reference to "partial" closings.[6] The majority held that D & M had violated the Agreement, and it ordered D & M to draft and implement a seniority list dovetailing the laid-off workers into its work force; to offer jobs to those employees on the dovetailed list commensurate with their seniority; and to make whole Allied's employees who accepted those jobs.

The plaintiff sought to have the arbitration award vacated by the Western District of Kentucky under section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, and jurisdiction was invoked under 28 U.S.C. § 1337. The Magistrate Judge recommended that the defendant's motion for summary judgment be granted. Citing the Supreme Court's *Steelworkers Trilogy*[7] and *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987), the Magistrate concluded that the board was within its authority when it construed the terms of the Agreement, and that the board rendered an award drawn from the Agreement's essence. The District Court accepted the Magistrate's recommendations and entered summary judgment for the defendant.

## II.

■ Appellate courts review a grant of summary judgment *de novo*. *See, e.g., International Ass'n of Machinists v. Lourdes Hospital*, 958 F.2d 154, 156 (6th Cir.1992); *EEOC v. University of Detroit*, 904 F.2d 331, 334 (6th Cir.1990). Summary judgment is appropriate only when there is no genuine issue of material fact, and the moving party is therefore entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2551–53, 91 L.Ed.2d 265 (1986); Fed. R.Civ.P. 56(c).

■ The essential sources for appellate review of an arbitrator's decision are the Supreme Court's *Steelworkers Trilogy* and its more recent decision affirming those cases in *Misco*, 484 U.S. at 29, 108 S.Ct. at 364. In *Misco*, the Court held that the authority possessed by appellate courts in reviewing arbitration awards is strictly limited to determining whether the arbitrator was "arguably construing or applying the contract and acting within the scope of his authority." *Id.* at 38, 108 S.Ct. at 371.

> The courts are not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or misinterpretation of the contract. "The refusal of

---

6. That section states:
   When a terminal is closed or *partially* closed ... a sufficient number of employees necessary to perform the transferred work shall have the right to transfer to the terminal into which the work was transferred, if regular work is available [*i.e.,* follow the work]."
   (Emphasis added).

7. *United Steelworkers of America v. Enterprise Wheel & Car Co.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); *United Steelworkers of America v. Warrior & Gulf Navig. Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers of America v. American Mfg. Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960).

courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements. The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards." *Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 596, 80 S.Ct. 1358, 1360, 4 L.Ed.2d 1424 (1960). As long as the arbitrator's award "draws its essence from the collective bargaining agreement," and is not merely "his own brand of industrial justice," the award is legitimate. *Id.*, at 597, 80 S.Ct. at 1361.

*Misco*, 484 U.S. at 36, 108 S.Ct. at 370. *See also AT & T Technologies, Inc. v. Communications Workers*, 475 U.S. 643, 649–50, 106 S.Ct. 1415, 1418–19, 89 L.Ed.2d 648 (1986); *AP Parts Co. v. United Auto. Workers*, 923 F.2d 488, 491 (6th Cir.1991); *Lattimer–Stevens Co. v. United Steelworkers of America*, 913 F.2d 1166, 1168–69 (6th Cir.1990). "When the grievance procedure has been exhausted, the courts have nothing left to do but enforce the award. Courts are bound by the arbitrator's findings of fact and do not function as appellate courts or courts of review, but serve only to enforce the arbitrator's award." *IBEW, Local 429 v. Toshiba America, Inc.*, 879 F.2d 208, 209 (6th Cir. 1989).

■ The need for judicial deference to an arbitrator's choice of interpretation was explained by the Supreme Court in *Enterprise Wheel & Car*, one of the *Trilogy* cases, as follows:

[T]he question of interpretation of the collective bargaining agreement is a question for the arbitrator. It is the arbitrator's construction which [*sic*] was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his.

*Enterprise Wheel & Car*, 363 U.S. at 599, 80 S.Ct. at 1362. Nevertheless, the arbitrator's discretion in interpreting the collective bargaining agreement is also strictly circumscribed:

[The arbitrator's] award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.

*Id.* at 597, 80 S.Ct. at 1361. *See also IBEW, Local No. 1842 v. Cincinnati Electronics Corp.*, 808 F.2d 1201, 1203 (6th Cir.1987). An award fails to derive its essence from the agreement when (1) it conflicts with express terms of the agreement; (2) it imposes additional requirements not expressly provided for in the agreement; (3) it is not rationally supported by or derived from the agreement; or (4) it is based on "general considerations of fairness and equity" instead of the exact terms of the agreement. *National Gypsum Co. v. United Steelworkers of America*, 793 F.2d 759, 766 (6th Cir.1986) (citations omitted). *See generally Cincinnati Electronics*, 808 F.2d at 1203–04. The issue to be resolved here is whether the arbitration board drew the essence of its award from the collective bargaining agreement. We are satisfied that this was done.

■ The plaintiff contends that the arbitrators ignored the plain language of the Agreement, thereby violating the first factor of *National Gypsum*. It first points to the board's interpretation of Article 5, § 4(c) and argues that, to reach its conclusion, the majority disregarded § 4(c)'s plain language concerning two or more employers "sharing" traffic from the same shipper. The board, however, considered this in its discussion of the possible interpretations of that subsection. While we may disagree with these interpretations of the subsection, we cannot review them as erroneous interpretations. *See AP Parts*, 923 F.2d at 491. Thus, this is a question of interpretation left to the arbitrators' legitimate discretion. *See, e.g., Enterprise Wheel & Car*, 363 U.S. at 597, 80 S.Ct. at 1361. That this authority was within the sound discretion of the board is bolstered in part by the first sentence of Article 5, § 8, which specifies by its terms that the rules contained within that article "are intended solely as general standards."

This, however, does not completely resolve the plaintiff's challenge.

The plaintiff further contends that the majority of the arbitrators erred in their extensive reliance upon the rest of Article 5, § 8. D & M notes that section's specificity in allowing the Joint Committee to resolve knotty dilemmas of seniority, like this one, by modification or amendment. The plaintiff reasons that the power to amend, modify or add conditions to the Agreement is explicitly reserved only to the National or Area Committees' actions—not to an arbitration board. The plaintiff argues that what the arbitrators did was not to interpret subsection 4(c); rather, they modified its meaning to allow coverage for "partial" cancellations.

■ The board was presented with a challenge. It had to interpret the Agreement in the light of facts that were not explicitly covered under any of the Agreement's sections. There was also a relative dearth of prior Committee interpretation. In its April 1988 decision, the National Committee examined § 4(c)'s predecessor and determined that it was not totally applicable because Allied was not cancelled by Ford but was still used at KTP. The arbitrators recognized, however, the preference for seniority rights as expressed in Article 5, § 2. Like the National Committee, the majority reviewed the various sections of the Agreement and their possible interpretations. They determined that the closest relevant section was Article 5, § 4(c). While relying upon Article 5, § 8 as the basis for not having to choose specifically one of the varying interpretations for § 4(c), the arbitrators adopted their construction of § 8 in part because of the National Committee's own reliance upon that section to resolve the April 1988 dispute. It was to give effect to that prior decision, under even more compelling facts, that the majority "require[d] application" of § 8. The board therefore tailored its award as closely as possible to conform with the language of the Agreement and with prior interpretations of the body that was specifically authorized to modify or adapt the Agreement, the National Com-

mittee. A court may disagree with this interpretation, but it cannot dispute that this was but one of several rational interpretations. Accordingly, a court is not authorized to reject this plausible interpretation. *See, e.g., American Federation of Television & Radio Artists v. Storer Broadcasting Co.,* 745 F.2d 392, 398 (6th Cir.1984).

Additionally, the fact remains that the very body specifically authorized to modify or amend the Agreement was irreparably deadlocked on the underlying grievance, thereby requiring arbitration under the terms of the collective bargaining agreement. Outside Article 9, § 7, no other portion of the Agreement specifies the role and limits of arbitration. The board therefore determined that its opinions were within its authority to interpret and apply the Agreement. This action was also within the informed judgment of the arbitrators, and it was the remedy for which the parties had specifically bargained. *See Enterprise Wheel & Car,* 363 U.S. at 597 & 599, 80 S.Ct. at 1361 & 1362. This resolution is a far cry from those cases in which the arbitrator either totally disregarded the plain language of the contract or administered a personal "brand of industrial justice." *Cf. Ficks Reed Co. v. Allied Indus. Workers of America,* 965 F.2d 123 (6th Cir.1992) (arbitrator ignoring plain language of agreement); *Lourdes Hospital,* 958 F.2d at 157 (arbitrator essentially devising a new contractual term); *AP Parts,* 923 F.2d at 491 (arbitrator justifying findings solely in terms of his personal "sense of equity"); *Toshiba America,* 879 F.2d at 210 (arbitrator simply refusing to apply terms of agreement). *See also National Gypsum,* 793 F.2d at 766.

■ The arbitration award may indeed create economic disincentives. The plaintiff may well have sound economic reasons why it would prefer to use only its own employees, be they from KTP or outlying operations. It may be dissatisfied with the level of training or expertise of its former competitors' employees. It may also be that the parties simply prefer not to renegotiate the Agreement, from a desire to

avoid dog-eat-dog conflicts between the various employers' workers, from general satisfaction with the bulk of the existing provisions, or out of mere avoidance of conflict. A court would be wrong, however, to strike down an arbitration award solely for these economic reasons. The answer to the economic disincentives, from this perspective, is simple: the parties should resolve these matters at the bargaining table, not in a court of law. Such concerns are appropriately left up to employers and unions and to their next round of collective bargaining for resolution.

Accordingly, the judgment of the District Court is AFFIRMED.