25 F.3d 1037
 NOTICE: First Circuit Local Rule 36.2(b)6 states unpublished opinions may be cited only in related cases.
 Jose HERNANDEZ, et al., Plaintiffs, Appellants,
v.
INTERNATIONAL LONGSHOREMEN ASSOCIATION, LOCAL 1575, et al.,
Defendants, Appellees.
 
 No. 93-2274.
 United States Court of Appeals,
First Circuit.
 June 6, 1994
 APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO [Hon. Hector M. Laffitte, U.S. District Judge ]
 John Ward Llambias for appellants.
 Nicolas Delgado Figueroa for appellee International Longshoremen Association, Local 1575.
 Rafael Cuevas Kuinlam, with whom Antonio Cuevas Delgado and Cuevas Kuinlam & Bermudez were on brief, for corporate appellees.
 D. Puerto Rico
 AFFIRMED.
 Before Selya and Boudin, Circuit Judges, and Carter,* District Judge.
 SELYA, Circuit Judge.
 
 
 1
 In this proceeding, appellants strive to convince us that, notwithstanding the deference routinely paid by courts to arbitral awards, this is the exception that proves the rule. We are not persuaded.
 
 I. BACKGROUND
 
 2
 Two decades ago, aware of Puerto Rico's dependency on marine transportation for future economic growth, the Commonwealth established the Puerto Rico Marine Shipping Authority (PRMSA). The agency's raison d'etre was to ensure "the citizens of Puerto Rico ... an adequate and inexpensive supply of basic commodities, and to foster the development and expansion of trade and industry...." P.R. Laws Ann. tit. 23, Sec. 3052 (1974). The statute authorized PRMSA to acquire shares in, and to operate, any enterprise that might assist in achieving the stated policy goals. See id. Sec. 3055.
 
 
 3
 In 1974, PRMSA purchased certain assets of Sea Land Services, Inc. (Sea Land) and Sea Train Lines, Inc. (Sea Train). It also bought all the outstanding shares of Transamerican Trailer Transport Corporation (TTT). Both Sea Land and Sea Train used the "Lo-Lo" method of loading and unloading vessels, while TTT used the "Ro-Ro" method.[1] Local 1740 of the International Longshoremen Association (ILA) represented Sea Train's stevedores (all of whom did Lo-Lo work). ILA Local 1575 represented Sea Land and TTT stevedores (some of whom did Lo-Lo work and some of whom did Ro-Ro work). The two unions negotiated separate collective bargaining agreements (CBAs).
 
 
 4
 Subsequently, PRMSA retained Marine Transport Management (MTM) to manage its Ro-Ro operation, and engaged Puerto Rico Marine Management, Inc. (PRMMI) to operate its Lo-Lo equipment. To carry out the terms of its engagement, PRMMI hired many Sea Train and Sea Land employees.[2] Both managers recognized the seniority that the dock workers previously had acquired while employed by TTT, Sea Train, and Sea Land, respectively. In time, PRMSA severed relations with MTM and placed PRMMI in charge of both Ro-Ro and Lo- Lo operations. When MTM's work force was transferred to PRMMI's payroll, the stevedores retained their seniority.
 
 
 5
 Local 1575 represents the dock workers for both Sea Land and PRMMI. It negotiated a separate CBA with each company. The CBAs dovetail in many ways, including the creation of a common pilot list (the CPL) from which "substitutes" are drawn. This list is arranged by seniority (whether acquired at Sea Land or PRMMI). It is further subdivided by department and job classification. The CPL is intended to broaden job opportunities by giving workers the ability to gain employment with either Sea Land or PRMMI, as vacancies in the permanent work force arise. Both companies use it as the prime resource for filling vacancies left by departing employees. When a regular worker retires, quits, or is cashiered, the highest ranked individual on the CPL is offered the position and, if he accepts, becomes a regular employee of either Sea Land or PRMMI, as the case may be.
 
 II. ORIGINS OF THE DISPUTE
 
 6
 Historically, the CPL contained separate rosters for Ro- Ro and Lo-Lo workers. Thus, for example, when a vacancy occurred in a Ro-Ro position, the post would be offered to the highest ranking Ro-Ro dock worker listed on the CPL, even if the list contained the name of a more senior Lo-Lo dock worker.
 
 
 7
 The stevedoring universe changed in February of 1992 when economic considerations prompted PRMMI to abandon the Ro-Ro system. PRMMI, Sea Land, and the union, after initially resorting to arbitration, agreed to merge the Ro-Ro and Lo-Lo lists, placing the affected employees on the CPL in order of overall seniority, effective April 10, 1992. The plan meant, in effect, that, within each occupational classification and department, a Ro-Ro worker with, say, twenty years of seniority, would be ranked on the CPL ahead of a Lo-Lo worker with nineteen years of seniority, even with respect to filling a vacancy in a position performing only Lo-Lo duties. Both the company and the union considered this strategy to be a more satisfactory alternative than terminating the Ro-Ro workers outright.
 
 
 8
 On April 23, 1992, more than forty of the Lo-Lo stevedores who had been pushed further down the CPL by the interleaving of the Ro-Ro stevedores sued PRMMI, Sea Land, and Local 1575 in the United States District Court for the District of Puerto Rico. Invoking section 301 of the Labor Relations Management Act, 29 U.S.C. Sec. 185, the displaced Lo-Lo workers alleged a breach of the duty of fair representation and a breach of contract, both stemming from a purported violation of their seniority rights. They sought to enjoin implementation of the revised CPL, pointing out that seniority in the Ro-Ro and Lo-Lo systems traditionally had been separate, and asseverating that Article VI, Clause 94 of the CBA between Local 1575 and PRMMI dictated that two distinct seniority lists were to be maintained.[3]
 
 III. THE ARBITRATOR'S AWARD
 
 9
 The district court stayed court proceedings temporarily and ordered the parties to arbitrate the dispute as mandated by the CBAs. The arbitrator treated the submitted claim as requiring him to resolve whether, "pursuant to the contractual provisions, the applicable laws and the prevailing practice, the claimants' seniority rights (in the common list of alternate Lo-Lo workers) had been violated or not since April 10, 1992, when they were displaced in that list by Ro-Ro workers." After analyzing the CBAs, the arbitrator concluded that intermingling the Ro-Ro and Lo- Lo employees on a single, revised CPL did not abridge plaintiffs' seniority rights.
 
 
 10
 The arbitrator based his decision on two principal grounds. First, he concluded that Clause 94 lost its meaning when the employer jettisoned the Ro-Ro system. The arbitrator wrote:
 
 
 11
 In the present case, there is no controversy as to whether PRMMI's Lo-Lo and Ro-Ro employees pertained to the same department (Marine Department) when the Ro-Ro system was eliminated, had the same classifications in either system, were all members of the Union and were covered by PRMMI's Collective Bargaining Agreement.
 
 
 12
 The evidence shows that the claimants were and they all appear as substitutes in the common pilot list and that regular employees that displaced them from the Ro-Ro system of the same department had their same classifications.
 
 
 13
 The claimants do not claim to have greater seniority than the Ro-Ro employees that displaced them nor that the latter group's classifications are different from theirs.... They claim that the seniority in both systems, always for a long period of years, was kept separately as provided for in clause 94 of Article VI of PRMMI's Collective Bargaining Agreement. The facts ... so show. Nevertheless, the facts also show that the Ro-Ro system was eliminated, ... and in that moment [Clause 94] lost its meaning for in the absence of the Ro-Ro system there was no reason to keep separate seniority lists. [footnotes omitted].
 
 
 14
 The arbitrator also justified his decision by reference to P.R. Laws Ann. tit. 29, Sec. 185c (1976) (Law No. 80), quoted infra note 5. In this regard,[4] he stated:
 
 
 15
 We understand that the elimination of the Ro-Ro system could not force PRMMI to lay-off the system's regular employees ... with less seniority in the same classification. Act No. 80 ..., the applicable law in this case, requires that when there are situations in which the employer must reduce its work force in the workplace, it is obligated to do it [by] following a seniority and classification order.
 
 
 16
 Inasmuch as ... the Ro-Ro employees, regular workers of the same classification and department as the claimants, had greater seniority than [the claimants] had, they had the right to displace the claimants in the common pilot list of April 10, 1992. [citation and footnote omitted].
 
 
 17
 The arbitral award became final on April 14, 1993. The plaintiffs asked the district court to set it aside. The court demurred, instead upholding the award and dismissing plaintiffs' complaint. This appeal ensued.
 
 IV. DISCUSSION
 
 18
 We bifurcate our analysis, first addressing appellants' exhortation that we should review the arbitrator's decision de novo. Concluding, as we must, that a more deferential standard of review obtains, we then address appellants' contention that the arbitrator's reasoning was palpably faulty, thereby invalidating the award.
 
 
 19
 A. Standard of Review.
 
 
 20
 Appellants boldly assert that, since seniority is a judicially defined term, its definition presents a question of law and, therefore, evokes plenary appellate review. In support of this somewhat jarring proposition, appellants rely on Mitchell v. Jefferson County Bd. of Educ., 936 F.2d 539 (11th Cir. 1991). Their reliance is misplaced.
 
 
 21
 Claiming that they were denied equal pay because of their gender, the Mitchell plaintiffs brought an action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000 et seq. See id. at 542. In resolving the controversy, the Mitchell court classified the issue of whether the employer had in place a bona fide seniority system as a question of law. See id. at 544. But Mitchell has no relevance here. It dealt with whether a particular system of seniority could be considered bona fide within the meaning of a federal civil rights statute.
 
 
 22
 This case, in contrast, deals with a seniority system of unchallenged validity, and focuses on an arbitrator's interpretation of the contractual provisions governing how particular kinds of seniority affect job eligibility under the CBA. A de novo standard of review is plainly inappropriate in such a context because an arbitrator's award concerning contractually conferred seniority rights must be treated with great deference by a reviewing court. See Larocque v. R.W.F., Inc., 8 F.3d 95, 96 (1st Cir. 1993); Dallas & Mavis Forwarding Co. v. Local 89, 972 F.2d 129, 133 (6th Cir. 1992); Armstrong Lodge No. 762 v. Union Pac. R. Co., 783 F.2d 131, 134 (8th Cir. 1986).
 
 
 23
 The rationale undergirding these precedents is impeccable. Many years ago, the Supreme Court cautioned that "[t]he federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of [arbitral] awards." United Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 596 (1960). Consequently, "[i]n labor arbitration, matters of contract interpretation are typically for the arbitrator, not for a reviewing court." El Dorado Tech. Servs. v. Union Gen., 961 F.2d 317, 319 (1st Cir. 1992).
 
 
 24
 Where, as here, parties in the work place agree in a CBA to submit future disputes to binding arbitration, they almost always will be bound by the outcome of a properly constituted arbitral proceeding. See Posadas de Puerto Rico Assocs., Inc. v. Asociacion de Empleados de Casino, 821 F.2d 60, 61 (1st Cir. 1987). So long as an arbitrator's award "draw[s] its essence from the collective bargaining agreement," and the arbitrator is "acting within the scope of his delegated authority, his decision must be upheld." El Dorado Tech. 961 F.2d at 319; accord United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 38 (1987); Dorado Beach Hotel Corp. v. Union de Trabajadores de la Industria Gastronomica, 959 F.2d 2, 4 (1st Cir. 1992); Georgia-Pacific Corp. v. Local 27, Etc., 864 F.2d 940, 944 (1st Cir. 1988); Berklee Coll. of Music v. Berklee Chapter of Mass. Fed'n of Teachers, 858 F.2d 31, 32 (1st Cir. 1988), cert. denied, 493 U.S. 810 (1989).
 
 
 25
 This does not mean that an arbitrator's discretion is unlimited. The standard, however, is an unusually deferential one and the uphill climb confronting a challenger is correspondingly steep. Apart from cases involving fraud, lack of jurisdiction, or procedural defects, none of which are alleged here, a court will not vacate an arbitral award unless it "is based on reasoning so palpably faulty that no judge or group of judges could ever conceivably have made such a ruling, or [unless it] is mistakenly based on a crucial assumption which is decidedly a non-fact." Challenger Caribbean Corp. v. Union Gen. de Trabajadores, 903 F.2d 857, 861 (1st Cir. 1990) (citations and internal quotation marks omitted). Such is the standard that must be applied to the arbitral award in this case.
 
 
 26
 B. The Merits of the Arbitral Decision.
 
 
 27
 Appellants also assert that the arbitrator's decision is based on faulty reasoning concerning the operability of Clause 94, compounded by a misreading of Puerto Rico law, and that these defects amount to gross error warranting vacation of the award. We disagree.
 
 
 28
 We have examined the arbitrator's conclusion that Clause 94 became meaningless and, therefore, inoperative, after the Ro-Ro system became obsolete. We do not find that this conclusion is based on reasoning so vagarious that the award must be vacated. To the contrary, perscrutation of the entire record convinces us that the arbitrator's finding is logical and constitutes a fair reading of the CBA. Of course, as appellants' counsel eloquently urges, another reading is possible; but, when there are two plausible ways to interpret provisions within a collective bargaining agreement, and the arbitrator chooses one of them, his decision cannot be regarded as palpably faulty.
 
 
 29
 We see no need to load more cargo on a full pallet. The arbitrator's decision is closely reasoned and the district court's memorandum and order, refusing to vacate the arbitral award, carefully elucidates why the award must be upheld, see Hernandez v. ILA, Local 1575, No. 92-1536 HL, slip op. at 4-7 (D.P.R. Oct. 6, 1993). No useful purpose would be served by launching our own exegesis. It suffices to say that the final award has all the earmarks of thoughtful consideration, including unmistakable signs of a search for the fairest resolution of the dispute within the confines of the CBA. We detect no gross error here.
 
 
 30
 Finally, appellants allege that the arbitral award is based, at least partially, on an incorrect reading of Law No. 80.[5] As the arbitrator interpreted the statute, an employer, when making layoff decisions, must ordinarily honor seniority within the affected job classification. Thus, as both Ro-Ro and Lo-Lo workers have the same classification, PRMMI would have been risking a violation of the law if it had chosen simply to furlough regular Ro-Ro employees while allowing Lo-Lo employees with less seniority to retain their positions on the CPL. The district court essentially endorsed the arbitrator's view. See Hernandez, supra, slip op. at 6. Appellants strive to confess and avoid: they do not dispute the arbitrator's vision of how the statute functions, but, rather, they contend that the statute does not apply to employees who work under a CBA.
 
 
 31
 Appellants misread the effect and purpose of Law No. 80. The Puerto Rico Department of Labor's interpretive guidelines discuss the impact of the statute in the collective bargaining context:
 
 
 32
 Act No. 80 contains provisions regarding the right of the worker to be preferentially retained over others when the employer is forced to lay-off employees and on his right to be preferentially re-employed when that same employer has to recruit employees after lay-off. That manifestation of public policy prevails over clauses contained in collective bargaining agreements which result in violation of the same.
 
 
 33
 Mario Morales Reyes, Puerto Rico Dep't of Labor and Human Resources: Guidelines for the Interpretation and Application Of Act No. 80, at 58-59 (1979) (emphasis supplied). Given this clear statement of public policy by the government of Puerto Rico, we think that the arbitrator had a sufficient basis to rely on Law No. 80 as part of the rationale for his decision.
 
 V. CONCLUSION
 
 34
 We need go no further. We agree with the district court that, here,
 
 
 35
 the arbitrator's decision was drawn from the collective bargaining agreement and applicable law. The award's reasoning is not palpably faulty nor mistakenly based on a crucial assumption. The argument that the elimination of the Ro-Ro system discharged the applicability of Section 94 is supported by ... the record. The argument that the inclusion of Ro-Ro employees on the common pilot list was pursuant to Law 80 is also valid. The arbitrator's [analysis] does not amount to manifest error of law....
 
 
 36
 Hernandez, supra, slip op. at 6-7. Hence, the judgment of the district court upholding the arbitral award must be
 
 
 37
 Affirmed.
 
 Appendix
 
 38
 1. Article VI, Clause 94 of the collective bargaining agreement between PRMMI and Local 1575 provides:
 
 
 39
 PRMMI will keep separate the Lo-Lo and Ro-Ro seniorities, and in the receipt and dispatch may use on line of Ro-Ro and Lo-Lo when the work merits to receive or dispatch. In the maintenance area the employer will maintain said area separate, except that it may pass work from one area to another if and when said situation is merited.
 
 
 40
 The collective bargaining agreement between Sea Land and Local 1575 does not contain this provision. With the exception of Clause 94, the two collective bargaining agreements contain the same provisions in relation to an employee's seniority.
 
 
 41
 2. Article I-C(1) of both collective bargaining agreements provides:
 
 
 42
 Seniority is defined as the continuous service time in the Company by department (Warehouse, Car Division, Maintenance, Marine) from the commencement date as employee in said company within the contracting unit, if and when the employee is efficient, complies with the conditions of this Agreement and the rules of the Company for which he works, except in the Marine Department that seniority will be by gangs and not by seniority of the employee within the contracting unit and in the Maintenance Department that seniority will be by classification within the same department.
 
 
 43
 3. Article I-C(3)(c) of both collective bargaining agreements provides:
 
 
 44
 The seniority lists shall be prepared in accordance with this Agreement, maintaining the seniority and classification orders as a pilot list, once the necessary corrections are made.
 
 
 45
 4. Article I-D(6)(a) of PRMMI's collective bargaining agreement is identical to Article I-C(8)(a) of Sea Land's agreement. The clause provides:
 
 
 46
 A pilot seniority list by classification shall always be kept as it has up to this day. From said list, each Company will keep their own regular employees by classification. When a vacancy occurs, the first substitute from said classification with greatest seniority shall be used.
 
 
 47
 5. Article XV(C) of the collective bargaining agreement between PRMMI and Local 1575 provides in pertinent part:
 
 
 48
 Any dispute that cannot be settled through the complaint and grievance procedure, and any dispute with respect to the interpretation or alleged violation of any provision of this agreement shall be submitted in writing to arbitration.
 
 
 49
 The collective bargaining agreement between Sea Land and Local 1575 contains a substantially similar clause.
 
 
 
 *Of the District of Maine, sitting by designation.
 
 
 [1]
 "Lo-Lo" is an acronym for "lift on, lift off," an operational system in which a crane is used to load and unload cargo containers in the course of merchant marine activity. "Ro-Ro" is an acronym for "roll on, roll off," an operational system whereby cargo containers are rolled in and out of merchant ships by means of ramps and other special equipment designed for this purpose. For a fuller exposition, see Trailer Marine Transport Corp. v. Rivera Vazquez, 977 F.2d 1, 3 (1st Cir. 1992)
 
 
 [2]
 Both Sea Train and Sea Land continued their operations, using other employees. In 1982 Sea Train ceased operations and released its work force. It is not involved in the current litigation
 
 
 [3]
 Clause 94 and other relevant provisions excerpted from the CBAs are reproduced in the appendix hereto. In each instance, we use unofficial translations provided by the parties or by the arbitrator
 
 
 [4]
 An arbitral award may sometimes incorporate state law not inconsistent with established principles of federal labor law. See Dorado Beach Hotel Corp. v. Union de Trabajadores de lo Industria Gastronomica, 959 F.2d 2, 4 (1st Cir. 1992); Challenger Caribbean Corp. v. Union Gen. de Trabajadores, 903 F.2d 857, 866-67 (1st Cir. 1990)
 
 
 [5]
 The statute provides in pertinent part:
 In any case where employees are discharged ... it shall be the duty of the employer to retain those employees of greater seniority on the job with preference, provided there are positions vacant or filled by employees with less seniority in the job within their occupational classification which may be held by them....
 P.R. Laws Ann. tit. 29, Sec. 185c (1986).