JOURNAL ENTRY AND OPINION
This is an appeal from an order of Judge Anthony O. Calabrese vacating the decision of Arbitrator Edward J. O'Connell that denied a grievance filed by the Association of Cleveland Fire Fighters, Local 93 of the International Association of Fire Fighters ("Union"), that sought to end the appellant City of Cleveland's ("City's") practice of "arrowing" fire fighters into work shifts. The City also claims it was error for the judge to order it to cease arrowing and set a hearing to determine compensation for affected employees. We affirm that part of the judgment vacating the arbitrator's ruling, but reverse the part that orders affirmative relief.
From the record we glean the following: in 1977 the parties agreed to a collective bargaining agreement ("CBA") that contained an ARTICLE titled "Hours of Duty." Under that contract, fire fighters not assigned to a normal eight-hour day are assigned to one of three twenty-four hour shifts designated A, B, and C:
 * * * the normal work week shall consist of one (1) twenty-four (24) consecutive hour shift, followed by forty-eight (48) consecutive hours off work with an additional twenty-four (24) consecutive hours off work once every three (3) weeks so that no person shall average more than forty-eight (48) hours per week within the said three (3) week period.
In 1988, fire fighters on this schedule were given an extra twenty-four hour shift off work every ninth week in order to bring the final average to forty hours per week over each nine week period. The single day off every third week is known as a "special day," while the day off every ninth week is known as a "cycle day."
The City had utilized a similar schedule prior to the first CBA and, since the 1960's, had employed the practice of "arrowing" to balance manpower across shifts. A fire fighter who is "arrowed" is relieved of his duty to work his scheduled work day and required to work on an off-day at regular pay. For example, an "arrowed" A shift fire fighter would be assigned for one day to fill a "Special Day" or "Cycle Day" vacancy on a B or C shift, which meant that he had only twenty-four hours off between work days instead of forty-eight hours, and increased the preceding or subsequent off-work period from forty-eight to seventy-two hours. The term "arrowing" apparently was derived from the practice of documenting that assignment to a different shift by erasing his A shift place on the company's master calendar and pointing an arrow to show whether he was scheduled to work instead either the day before or the day after.
Under R.C. Chapter 4117, the Union's CBA is renegotiated every three years, and the 1989 agreement contained new language, in an ARTICLE titled "Seniority":
 Firefighters [sic] in a Unit * * * shall pick shifts, special days, and cycle days in their Unit, and Battalion Chiefs, Company Officers and Rovers shall pick shifts, special days and cycle days according to past practice, prior to selection of vacations and personal days. All selections shall be by rank and seniority and shall be chosen by December 15 for the following year.
 All vacation selections shall be by rank and seniority and shall be chosen by January 30 of the vacation year.
 A shift selection within the Union [sic] or Battalion may be changed by a Company, Unit Commander or Battalion Commander where a discipline or morale problem must be solved, or for efficient operation of the Unit or Battalion.
This language has continued in all remaining versions of the CBA, although the Union has attempted to amend it. The CBA prohibits both strikes and lockouts, and requires the parties to reach agreement or submit impasse terms to a panel of arbitrators, who are required to select, without modification, one of the parties' submitted terms. In 1992 the Union proposed deletion of the paragraph allowing a shift commander to change shifts, and the addition of language providing that the fire fighters' shift selections could not be changed without written permission of the affected employee. The City rejected the proposal, and the Union did not seek "impasse arbitration."
In both 1995 and 1998, the Union proposed additional language requiring advance notice of the "arrowed" shift changes and premium pay for affected members, but the City again rejected the changes and the Union again declined to force final arbitration. In 1999 the Union filed a grievance alleging that arrowing violated the "hours of duty" provisions of its CBA, and the grievance was submitted to the arbitrator.
He denied the grievance on the basis that the 1989 shift change language authorized arrowing, and that the Union understood it in that context because of its attempts to amend the language in subsequent contract negotiations. Alternatively, he found that arrowing was a binding part of the CBA as an enforceable past practice because it had been utilized since the 1960's without challenge, and had been the subject of contract negotiations in which the Union had unsuccessfully tried to "bargain it out." He rejected the Union's claims that the current grievance was a response to an increase in incidents of arrowing, and found that the evidence did not "establish any highly unusual increase in the incidence or scope of arrowing."
The Union appealed the decision to the Common Pleas Court, and both it and the City moved for summary judgment. Without opinion, the judge denied the City's motion, vacated the arbitrator's award, ordered the practice of arrowing to cease, and scheduled a hearing on the Union's request for compensation for instances of arrowing.
The City's appeal, initially dismissed for lack of a final appealable order, was then certified under Civ.R. 54(B).
The first of the City's assignments of error states:
 I. THE TRIAL COURT COMMITTED REVERSIBLE ERROR AND EXCEEDED ITS STATUTORY AUTHORITY UNDER [R.C.] 2711.10 IN GRANTING THE APPELLEE'S MOTION TO VACATE THE UNDERLYING ARBITRATION AWARD WHERE THE ARBITRATOR'S DECISION DREW ITS ESSENCE FROM THE TERMS OF THE PARTIES' COLLECTIVE BARGAINING AGREEMENT AND WAS NOT OTHERWISE ARBITRARY, CAPRICIOUS, OR UNLAWFUL.
Because the judge's order essentially granted summary judgment to the Union, we review the decision de novo, using the same standard as a trial judge.[1] In this case we must apply the same deference to the arbitrator's decision that the judge is statutorily bound to afford.[2]
R.C. 2711.10(D) allows vacation of an arbitrator's ruling if the arbitrator has exceeded his authority. The arbitrator's decision exceeds his authority if:
 (1) it conflicts with express terms of the agreement; (2) it imposes additional requirements not expressly provided for in the agreement; (3) it is not rationally supported by or derived from the agreement; or (4) it is based on "general considerations of fairness and equity" instead of the exact terms of the agreement.[3]
Most recently the Ohio Supreme Court has held that "courts are limited to determining whether an arbitration award is unlawful, arbitrary, or capricious and whether the award draws its essence from the CBA."[4]
Under ARTICLE XII, GRIEVANCE PROCEDURE, Step 4, of the CBA:
 In the event a grievance goes to arbitration, the arbitrator shall have jurisdiction only over disputes arising out of grievances as to the interpretation and/or application and/or compliance with the provisions of this Contract, including all disciplinary actions and in reaching his decision, the arbitrator shall have no authority (1) to add to or subtract from or modify in any way any provisions of this Contract; (2) to pass upon issues governed by law; or (3) make an award in conflict with law. * * *.
The arbitrator found that the "hours of duty" provisions, standing alone, would prohibit arrowing, but that the plain meaning of the language in ARTICLE V, SENORITY, added in 1989, authorized arrowing. We do not agree. The language added in 1989 does not plainly refer to temporary balancing of shift strength via arrowing, but refers to shift changes imposed after employees have selected shifts on a seniority basis. On its face, the provision appears to contemplate a person-for-person shift substitution — for example, if the commander believed that too many senior employees had selected a single shift, leaving other shifts without enough experienced fire fighters, the commander would be entitled to change those selections. Because employees are entitled to select "shifts, special days and cycle days within their Unit," the definition of "shift" appears to mean the permanent selection of one of the three twenty-four hour (A, B, or C) Unit shifts. Within each shift, the employees are then required to select special days and cycle days. Therefore, the commanders' power to change a "shift selection," on its face, refers to the permanent selection of A, B, or C shift, and does not plainly contemplate temporary changes to balance manpower between shifts.
The CBA consistently uses the term "shift" to refer to a collective assignment of scheduled days, and not to single days. When the word "shift" is used to refer to a single, twenty-four hour shift rather than a collective schedule, that limitation is expressly stated.[5] Without such limitation, a "shift selection" does not refer to a single day, and thus the ability to change a shift selection does not include the power to change a single work day.
He also found, however, that evidence indicated the Union understood that the language authorized arrowing because its conduct and the past practice of arrowing supported his interpretation of the CBA. Although the parties have cited numerous arbitration decisions concerning the import of a "past practice," we view the issue in accordance with normal contract principles — the past practice of arrowing and the parties' negotiations are to be judged under the normal rules concerning construction of contracts and parol evidence.
"It is a well-known principle that contracts are to be interpreted so as to carry out the intent of the parties, as that intent is evidenced by the contractual language.[6] Where the parties have reached a final, written agreement with respect to at least some terms, evidence of prior agreements or negotiations cannot be used to contradict those terms.[7]
Where the written agreement is not final as to all terms, parol evidence can be used to supply consistent additional terms.[8] Regardless of whether the agreement is completely or partially integrated, parol evidence can be used to establish the meaning of the written terms, but a judge must find an ambiguity in the written terms before allowing parol evidence in aid of interpretation.[9] The parol evidence rule, however, forbids only evidence of prior agreements or negotiations; the parties' conduct in performing a contract is both admissible and significant evidence in interpreting its terms.[10]
We first address the arbitrator's conclusion that arrowing was an agreed-upon term, either through construction of the CBA's written terms or as an additional agreement. As already noted, even though the City points to the Union's acquiescence in arrowing as evidence that it considered the practice an agreed-upon term, the arbitrator erred in finding that any of the CBA's written terms could be interpreted as an agreement concerning arrowing. Regardless of the course of conduct, nothing in the CBA indicates the parties bargained for and agreed to any provisions concerning arrowing. Where a contract's express terms cannot reasonably be construed as consistent with the parties' course of conduct, the express terms prevail.[11]
Before adding a term not included in a written expression of an agreement, we must determine whether the written agreement is integrated and, if so, whether it is completely integrated. Under ARTICLE II, MANAGEMENT RIGHTS, the City retains the right:
 [e]xcept as expressly limited by the terms of this Contract * * * [to] transfer, assign, [and] schedule, employees; * * * [e]ffectively and efficiently manage the workforce; and, * * * to implement new or revised existing policies which do not conflict with the express terms of this Contract.
ARTICLE VIII, HOURS OF DUTY, Section A, contains references to exceptions from the terms of the normal work week and refers to "present practice" involving the lengths of shifts in certain units and areas. Section B, Morning Overtime, requires overtime pay when responding to an alarm extends past the twenty-four hour work day, while Section C is directed to "Holdover Time (not for alarm)" and governs situations where a fire fighter reports he is going to be late or will not be coming in at all. In these situations overtime pay is required except when a "trade" can be worked out with another fire fighter. Section D "Overtime" is directed toward a need for "non-hold over" overtime which is voluntary, subject to overtime pay, and is based upon a rotation list.
ARTICLE IX, VACATIONS, sets forth the process for selection and is based upon seniority within respective leave units and shifts. Sub-section B.7, provides:
 The above selection processes shall relate only to a selection of vacation and personal holidays. All other leaves and hours of work provisions shall be governed by those practices currently in effect in the Department.
ARTICLE XXVIII, STAFFING, makes reference to the number of fire fighters on certain fire suppression apparatus "in accordance with the practices existing on the date of the ratification of this Contract." Finally, by letter of August 26, 1999, to the Union, attached to the CBA, the City agreed "for the life of the 1998-2001 collective bargaining agreement, it will continue its current practices regarding the assignment of fire fighters to the duties of a Battalion Aide."
Where a writing is considered to be final but incomplete, it is partially integrated and, while its terms cannot be contradicted, it may be supplemented by evidence of consistent additional terms.[12] Both the City and the Union consider the CBA a final expression of their agreement, but its language in various Articles, "supra," reveals it was not intended to be a complete expression of the agreement on the terms governing the various subjects.
Arrowing, however, is not a subject referred to in the CBA, nor is it defined or encompassed in any category within it, including the cited practices, and we reject the proposition that it can be incorporated into the CBA as a consistent additional term. A consistent additional term is often thought of as one that "in the circumstances might naturally be omitted from the writing."[13] While this analysis technically is used only to determine whether an agreement is completely integrated with respect to a consistent term, we find it instructive here in determining whether the term is in fact consistent.
The practice of arrowing, had it been fully negotiated and agreed-upon, would have been included among the CBA's written terms. As already discussed, in the absence of any written terms that can fairly be interpreted as an agreement concerning arrowing, the Union's acquiescence is not evidence that it agreed to the practice as a contractual term. Because such an agreement normally would be part of the written terms, the Union's acquiescence also cannot be taken as evidence of an agreement to an additional term; a course of conduct does not always indicate an agreement[14] and, as discussed below, the conduct here is consistent not with agreement, but with a concession of the City's authority to act in the absence of agreement. Moreover, even though the practice of arrowing does not directly contradict the written terms, neither does it arise as a natural or expected consequence of them.
Not only do the normal rules of parol evidence prohibit adding an arrowing provision as a consistent additional term, the CBA also prohibits it. ARTICLE XII denies the arbitrator authority to add to or subtract from or modify in any way any provisions of this Contract[,] thus prohibiting additional terms regardless of whether the CBA is completely or only partially integrated. The arbitrator's authority was limited to determining whether the written terms authorized arrowing and, as noted, they did not.
We also find that the CBA is not ambiguous with respect to arrowing. As noted supra, the CBA consistently defines a "shift" as a collective work schedule, and uses limiting language when referring to a shift as a single twenty-four hour period. Thus the commanders' authority to alter shift selections refers to their ability to substitute personnel permanently (or at least on a relatively permanent basis), and not to any perceived authority to make temporary schedule changes. The arbitrator was without authority to redefine terms or find them ambiguous when their meaning can be determined from the agreement itself.[15] The CBA is not ambiguous; the hours of duty set forth a "normal work week" that applies "[e]xcept in the case of emergencies[.]"
The past practice of arrowing cannot be used to show an ambiguity because, as noted, the Union's acquiescence does not indicate its agreement, and the parties' course of conduct cannot alter written terms that are not susceptible to the meaning sought. Nor can evidence of prior negotiations or agreements be used, because "[i]f no ambiguity appears on the face of the instrument, parol evidence cannot be considered in an effort to demonstrate such an ambiguity."[16] While we recognize that the arbitrator sought to give effect to the parties' recognition of arrowing, the past practice does not rise to the level of a contract term.
This is not, however, a determination that the CBA prohibits arrowing. R.C. 4117.08 provides for matters subject to collective bargaining agreements, those which are not appropriate, and those for which the City may reserve its rights. Subjects which affect wages, hours, terms and conditions of employment require collective bargaining. R.C. 4117.10(A) provides:
 An agreement between a public employer and an exclusive representative entered into pursuant to this chapter governs the wages, hours, and terms and conditions of public employment covered by the agreement. * * * Where no agreement exists or where an agreement makes no specification about a matter, the public employer and public employees are subject to all applicable state or local laws or ordinances pertaining to the wages, hours, and terms and conditions of employment for public employees.
Arrowing affects the hours, terms, and conditions of employment but, despite the Union's recent efforts to govern the practice by negotiating its terms and incorporating it into the CBA, it is not within the ambit of the agreement before us, although clearly subject to future collective bargaining. Under the CBA in question, the City retained its ability to utilize arrowing because there was no agreement or specification concerning it,[17] the practice was not "expressly limited by the terms of this Contract[,]"[18] nor did it violate any State or local laws. The parties' conduct is consistent with the City's reservation of rights where no agreement exists — the Union acquiesced to arrowing not because it agreed to the practice, but because the City had the right to engage in arrowing absent an agreement governing or prohibiting the practice.
The Union asked the arbitrator to determine whether arrowing violated Article VIII, Section A of the CBA. The reasoning underlying his denial of the grievance was his belief that the absence of language addressing arrowing created an ambiguity that required the Union to surrender its right to collectively bargain a subject that governs or affects its wages, hours, terms and conditions of employment. Moreover, his interpretation of the 1989 ARTICLE V shift change language imposed additional requirements not expressly provided for in the agreement. Therefore, although the arbitrator correctly determined that arrowing does not violate the CBA because the parties reached no agreement on the subject, he nevertheless exceeded his authority in finding that the CBA authorized arrowing, and the judge could properly vacate the ruling for correction of this error. The first assignment of error is overruled.
The second assignment of error states:
 II. THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN, IN ADDITION TO ABROGATING [SIC] ITS AUTHORITY UNDER [R.C.] 2711.10 BY VACATING THE UNDERLYING ARBITRATION AWARD, IT WENT ON TO ORDER AFFIRMATIVE RELIEF AGAINST THE CITY OF CLEVELAND.
We agree that the judge exceeded his authority when he ordered the City to cease the practice of arrowing and scheduled a hearing to determine whether employees affected by the practice should be compensated. R.C.2711.10 limits the judge's authority to vacation of an arbitrator's award, and R.C. 2711.11 limits judicial modification of an arbitrator's award to circumstances not applicable here. Vacation of an order restores the parties to the position they were in prior to the order vacated.[19]
The second assignment of error is sustained.
Judgment affirmed in part reversed in part, and remanded for entry of judgment consistent with this opinion.
It is ordered that the parties bear their own costs herein taxed.
This court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
TIMOTHY E. McMONAGLE, P.J., and PATRICIA ANN BLACKMON, J., CONCUR.
[1] Buyer's First Realty, Inc. v. Cleveland Area Bd. of Realtors
(2000), 139 Ohio App.3d 772, 784-85, 745 N.E.2d 1069, 1078-79.
[2] Id.
[3] Dallas Mavis Forwarding Co., Inc. v. Gen. Drivers, Warehousemen Helpers, Local Union No. 89 (C.A.6, 1992), 972 F.2d 129, 134 (citation omitted).
[4] Southwest Ohio Regional Transit Auth. v. Amalgamated TransitUnion, Local 527 (2001), 91 Ohio St.3d 108, 110, 742 N.E.2d 630,633.
[5] "* * * the normal work week shall consist of one (1) twenty-four (24) consecutive hour shift * * *."
[6] Skivolocki v. East Ohio Gas Co. (1974), 38 Ohio St.2d 244,247, 67 O.O.2d 321, 313 N.E.2d 374, 376.
[7] Camargo Cadillac Co. v. Garfield Ent's, Inc. (1982),3 Ohio App.3d 435, 438-39, 3 OBR 514, 445 N.E.2d 1141, 1145.
[8] Id.
[9] Shifrin v. Forest City Ent's., Inc. (1992), 64 Ohio St.3d 635,597 N.E.2d 499, syllabus.
[10] 2 Restatement of the Law 2d, Contracts (1981) 86-90, Section 202(4), (5), and comment g; cf. R.C. 1301.11, 1302.11 (concerning course of dealing and course of performance in sales of goods).
[11] 2 Restatement of the Law 2d, Contracts, supra; cf. R.C. 1301.11(D), 1302.11(B).
[12] Calamari Perillo, The Law of Contracts (4 Ed. 1998) 129, Section 3.4.
[13] 2 Restatement of the Law 2d, Contracts (1981) 137, Section 216(2)(b).
[14] 2 Restatement of the Law 2d, Contracts (1981) 86-90, Section 202, comment g.
[15] Ohio Office of Collective Bargaining v. Ohio Civ. Serv. Emp.Assn., Local 11, AFSCME, AFL-CIO (1991), 59 Ohio St.3d 177, 181-82,572 N.E.2d 71, 75-76.
[16] Shifrin, 64 Ohio St.3d at 638, 597 N.E.2d at 501.
[17] R.C. 4117.10(A).
[18] ARTICLE II, MANAGEMENT RIGHTS.
[19] Close v. Motorists Mut. Ins. Co. (1985), 21 Ohio App.3d 228,231, 21 OBR 244, 486 N.E.2d 1275, 1279.